FREDERICKA HOMBERG WICKER, Judge.
 

 pin these consolidated appeals, plaintiffs/appellants Willard Eastin and Gerald Ruiz appeal judgments of the trial court granting exceptions of prescription in favor of defendants/appellees Entergy Corporation, Entergy Services, Inc., Entergy New Orleans, Inc. (formerly New Orleans Public Service, Inc.), Entergy Louisiana, Inc. (formerly Louisiana Power and Light, Inc.), and Entergy Gulf States, Inc. (formerly Gulf States Utilities, Inc.).
 
 [1]
 
 Plaintiffs/appellants Louis Frost, Charles Ohlmeyer, III, Willie Hickman, Linda Porrovecchio, Terry Canzoneri, and Marion Boudreaux appeal judgments of the trial court granting motions for summary judgment in favor of the defendants/ap-pellees. Plaintiffs’ suit alleges that their termination from employment by their employer, Entergy, was as a result of age discrimination in violation of La. R.S. 51:2231, the Louisiana Commission on Human Rights Act (“LCHRA”).
 

 The seminal issue in this case as to prescription is stated as follows: on what date did Entergy give unambiguous and authoritative notice of termination to each plaintiff causing prescription to run? In the wake of
 
 Gross v. FBL Financial Services, Inc.,
 
 — U.S. -, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009), the seminal issues in this case as to summary judgment are (1) has each plaintiff presented a|4material issue of fact as to whether there was direct or circumstantial evidence that Entergy engaged in age-based discrimination; (2) if so, did Entergy assert a legitimate, nondiscriminatory reason for terminating or effectively terminating each plaintiff; (3) if so, did each plaintiff present a material issue of fact as to whether Entergy’s legiti
 
 *1169
 
 mate, non-discriminatory reason for termination was a pretext for discrimination?
 

 For the reasons that follow, we hold that the trial judge did not err in granting the exceptions of prescription as to plaintiffs Willard Eastin and Gerald Ruiz. Further, we hold that the trial judge did not err in granting summary judgment as to plaintiffs Louis Frost, Charles Ohlmeyer, Linda Porrovecchio, Terry Canzoneri, and Marion Boudreaux. However, as to plaintiff Willie Hickman, we hold that Mr. Hickman presented a material issue of fact as to whether Entergy’s legitimate non-discriminatory reason for his termination was a pretext for age discrimination. Therefore, we reverse the grant of summary judgment as to plaintiff Willie Hickman and render judgment denying Entergy’s motion for summary judgment as to Mr. Hickman. We affirm the judgments of the trial court in all other respects and remand this matter for further proceedings consistent with this opinion.
 

 I. FACTS AND PROCEDURAL HISTORY COMMON TO ALL PLAINTIFFS
 

 The following pertinent facts common to all plaintiffs were presented at the hearings on Entergy’s various motions for summary judgment and exceptions of prescription.
 

 Entergy is a major integrated energy production and distribution company based in New Orleans, Louisiana. During a two-year period beginning in 1992, |sEntergy underwent a corporate restructuring that included extensive corporate downsizing. At that time, Edwin Lupberger was En-tergy’s chairman and chief executive officer. Beginning in the latter months of 1992, Mr. Lupberger made three public statements. The plaintiffs allege that in these statements, Mr. Lupberger expressed his desire to create a younger Entergy workforce at the expense of older workers. Mr. Lupberger made the first statement to a reporter from the New Orleans
 
 Times-Picayune.
 
 The
 
 Times-Picayune
 
 reported as follows:
 

 Lupberger expects the administrative staff of the merged company to be pared down rapidly. Older GSU executives are expected to take advantage of lucrative “golden parachute” retirement provisions granted them when the utility was on the verge of bankruptcy and had to negotiate with executives to keep them on board, he said. Lupberger said the merged firm would carefully select among younger executives from both Entergy and GSU to keep the best management material.
 

 Mark Schleifstein,
 
 GSU, Entergy Merger on Track,
 
 New Orleans Times Picayune, Dec. 5,1992 (emphasis added).
 

 Mr. Lupberger made the second and third public statements to two different groups of Entergy employees. On March 5, 1993, Mr. Lupberger indicated to employees “we’ve got to go with the younger people. They are our future. And as a result, that’s the kind of [corporate] culture we’re going to have.” In the third statement, Mr. Lupberger indicated to employees in a February 29, 1994 meeting that “Entergy would aggressively recruit younger, smarter people at colleges around the System, but some people from within would move up as well.”
 

 On November 29, 1993, Willard Eastin and seven additional plaintiffs filed a Petition for Damages, Declaratory Judgment, and Class Action (the “Petition”). The Petition alleged that the plaintiffs were employees of Entergy who “have been terminated ... because of age.” The Petition additionally alleged that the plaintiffs were between the ages of forty and seventy years old when they were discharged at various times during 1992 and 1993.
 
 *1170
 
 These discharges were alleged |6to be in violation of La. R.S. 51:2231, the Louisiana Commission on Human Rights Act (“LCHRA”), which “safeguard[s] all individuals within the state from discrimination because of race, creed, color, religion, sex, age, disability, or national origin in connection with employment.” The individual defendants named in the Petition were alleged to have engaged in systematic, unlawful discrimination against older experienced employees in favor of younger, less experienced employees.
 
 [2]
 
 The plaintiffs sought a declaratory judgment and class action status in the Petition.
 

 From January 1994 until April 24, 2000, the original eight plaintiffs filed seven subsequent supplemental and amending petitions and added approximately two hundred additional plaintiffs to the suit. The trial court certified the suit as a class action by a judgment signed on August 13, 1997. Entergy appealed that judgment. This Court reversed the judgment of the trial court and remanded for further proceedings.
 
 Eastin v. Entergy Corp.,
 
 97-1094 (La.App. 5 Cir. 4/15/98), 710 So.2d 835. We held that a lack of commonality among former employees prevented class certification and that the class defined by the district court encompassed an overly broad group of plaintiffs.
 
 Id.
 
 at 840-41. On October 15, 1999, the trial court signed a judgment decertifying the instant case as a class action.
 

 After this Court’s April 15, 1998 opinion reversing the trial court’s class certification judgment, Entergy sought dismissal of the claims of twenty-seven plaintiffs added to the suit in the plaintiffs’ seventh, eighth, and ninth supplemental and amending petitions. The seventh supplemental and amending petition was filed on April 24, 2000.
 
 See Eastin v. Entergy Corp.,
 
 07-212 (La.App. 5 Cir. 10/16/07), 971 So.2d 374, 376-77. The eighth supplemental and amending petition was filed on May 31, 2001.
 
 Id.
 
 The ninth supplemental and amending petition was filed on October 23, 2001.
 
 Id.
 
 By judgment signed on April 26, 2006, the trial court sustained Entergy’s exception of prescription as to all twenty-seven plaintiffs named in the seventh, eighth, and ninth supplemental and amending petitions.
 
 Id.
 
 at 378. On appeal, the plaintiffs contended that prescription never recommenced following the class’s decertification because notice of the decertification was never published to the putative class.
 
 Id.
 
 at 379-80. This Court affirmed in part, reversed in part, and remanded.
 
 Id.
 
 at 376. We reasoned that the claims of the plaintiffs added in the seventh supplemental petition were timely because the supplemental petition was filed within a year of the trial court’s October 15, 1999 judgment decertifying the case as a class action.
 
 Id.
 
 at 380-81. However, we held that the plaintiffs’ claims newly added in the eighth and ninth supplemental petitions were prescribed because the petitions were filed more than a year after the trial court’s October 15, 1999 judgment.
 
 Id.
 
 at 381.
 

 Subsequently, additional plaintiffs joined this suit. The trial court consolidated the actions and set this matter for trial. The trial court selected ten plaintiffs to participate in an initial “trial flight.” The ten plaintiffs selected to participate in the first trial were Willard Eastin, Gerald Ruiz, Louis Frost, Charles Ohlmeyer, III, Robert Braniff, Jr., Betty Dunbar, Willie Hick
 
 *1171
 
 man, Linda Porrovecchio, Terry Canzon-eri, and Marion Boudreaux. Entergy thereafter filed motions for summary judgment as to all ten defendants and exceptions of prescription as to Mr. Eastin and Mr. Ruiz. The trial court denied summary judgment as to Ms. Dunbar and Mr. Bran-iff. This Court and the Louisiana Supreme Court denied writs as to the claims. of Ms. Dunbar and Mr. Braniff.
 
 See Eastin v. Entergy Corp.
 
 08-833 (La. 5 Cir. App. 10/14/2008) (unpublished writ Isdecision),
 
 writ denied,
 
 2009-0026 (La.2/6/09), 999 So.2d 787 (as to Ms. Dunbar’s claims);
 
 Eastin v. Entergy Corp,
 
 08-652 (La. 5 Cir.App. 11/13/2008) (unpublished writ decision),
 
 writ denied,
 
 2008-2925 (La.2/6/09), 999 So.2d 786 (as to Mr. Braniffs claims).
 

 After four hearings, the trial court entered four separate judgments dismissing the claims of each of the eight remaining plaintiffs/appellants. By judgment dated June 16, 2008, the trial court granted En-tergy’s exception of prescription and dismissed Willard Eastin’s claims. By judgment dated July 1, 2008, the trial court granted Entergy’s motions for summary judgment and dismissed the claims of Marion Boudreaux and Linda Porrovecchio. By judgment dated September 24, 2008, the trial court granted Entergy’s motions for summary judgment and dismissed the claims of Terry Canzoneri, Willie Hickman, and Charles Ohlmeyer. By judgment dated October 14, 2008, the trial court granted Entergy’s motion for summary judgment and dismissed the claims of Louis Frost and granted Entergy’s exception of prescription and dismissed the claims of Gerald Ruiz.
 

 II. EXCEPTIONS OF PRESCRIPTION
 

 A. Applicable Law, including The “Ricks/Chardon Rule”
 

 A cause of action based on age discrimination is a delictual action subject to a one-year prescriptive period, which commences the day the injury or damage is sustained.
 
 Eastin v. Entergy Corp.,
 
 2003-1030 (La.2/6/04), 865 So.2d 49, 53; La. C.C. art. 3492. Prescription runs against all persons unless an exception is established by legislation. La. C.C. art. 3467. Although the party pleading prescription ordinarily has the burden of proof, the burden is shifted to the plaintiff when the petition on its face reveals that prescription has run.
 
 Riehm v. State Farm Mut. Auto. Ins. Co.,
 
 07-651 (La.App. 5 Cir. 1/22/08), 977 So.2d 1045, 1047. When prescription is raised by peremptory exception, and evidence is introduced at the hearing on the exception, the trial court’s findings of fact on the issue of prescription are subject to the manifest error-elearly wrong standard of review.
 
 Carter v. Haygood,
 
 04-0646 (La.1/19/05), 892 So.2d 1261, 1267.
 

 In
 
 Delaware State College v. Ricks,
 
 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), the United States Supreme Court addressed the filing requirements of Title VII of the Civil Rights Act of 1964.
 
 [3]
 
 The
 
 Ricks
 
 plaintiff was a Liberian faculty member at Delaware State College in Dover, Delaware.
 
 [4]
 
 On March 13, 1974, the college’s board of trustees voted to deny tenure to the plaintiff.
 
 Id.
 
 at 252, 101
 
 *1172
 
 S.Ct. 498. The plaintiff thereafter initiated an internal grievance proceeding. On June 26, 1974, the board of trustees notified the plaintiff “of its intent not to renew [his] contract at the end of the 1974-75 school year.”
 
 Id.
 
 at n. 2, 101 S.Ct. 498. The June 26 notice acknowledged that the result of the pending grievance proceeding could overturn the board’s decision, however, the grievance was denied on September 12,1974.
 
 Id.
 
 at 254,101 S.Ct. 498.
 

 On April 28, 1975, the
 
 Ricks
 
 plaintiff filed an employment discrimination complaint against the college with the Equal Employment Opportunity Commission (“EEOC”). The EEOC subsequently issued a “right to sue letter.”
 
 [5]
 

 Id.
 
 The plaintiff thereafter filed suit in federal court, alleging that in denying him tenure, the college discriminated against him on the basis of national origin in violation of Title VII and 42 U.S.C. § 1981. Id. The district court dismissed the plaintiffs claims as untimely, concluding that the alleged discriminatory event occurred on June 26, 1974, when the plaintiff received official notice of the denial | l0of tenure. Id. at 254-55, 101 S.Ct. 498. His April 28, 1975 complaint to the EEOC, therefore, fell well beyond the 180 day period statute of limitations under 42 U.S.C. § 2000e-5(e).
 
 Id.
 

 The United States Court of Appeals for the Third Circuit reversed the district court, but the United States Supreme Court reversed the Third Circuit. The Supreme Court began its analysis by noting that the determination of whether the plaintiffs complaint was filed in a timely manner required a precise identification of the unlawful employment practice of which the plaintiff complained.
 
 Id.
 
 at 257, 101 S.Ct. 498. Noting that termination of employment is “a delayed, but inevitable, consequence of the denial of tenure at Delaware State,” the Court concluded that the alleged discrimination occurred, and the filing limitation periods therefore commenced, at the time the tenure decision was made and communicated to the plaintiff.
 
 Id.
 
 at 257-58, 101 S.Ct. 498. The • Court continued, “[t]he proper focus is upon the time of the
 
 discriminatory acts,
 
 not upon the time at which the
 
 consequences
 
 of the acts became most painful.”
 
 Id.
 
 at 258, 101 S.Ct. 498 (emphasis in original). The Court held that the 180 day filing period commenced on June 26, 1974 because the board “formally rejected” the plaintiffs tenure bid and communicated that “official position” to the plaintiff on that date.
 
 Id.
 
 at 261, 101 S.Ct. 498. His action, therefore, was untimely.
 

 Less than one year after deciding
 
 Ricks,
 
 the Supreme Court decided
 
 Chardon v. Fernandez,
 
 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (per curiam).
 
 Chardon,
 
 like
 
 Ricks,
 
 involved an academic setting. Prior to June 17, 1977, each of the twenty-three
 
 Chardon
 
 plaintiffs received a letter informing them that their appointments would expire at the termination of the present scholastic year.
 
 Rivera Fernandez v. Chardon,
 
 648 F.2d 765, 766 (1st Cir.1981),
 
 rev’d,
 
 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981). Each plaintiff was given a demotion or termination date between June 30 and August 8,1977.
 
 Id.
 
 On June 19, 1978, the |nplaintiffs filed suit under 42 U.S.C. § 1983 alleging that they had been unlawfully terminated due to their political affiliations. The applicable statute of limitations prescribed a one year limit.
 
 Id.
 
 at 766-67. Hence, each complaint was timely if measured from the actual termination or demotion of employ
 
 *1173
 
 ment but untimely if measured from when the plaintiffs were informed of the termination.
 
 Id.
 
 The United States Court of Appeals for the First Circuit concluded that the plaintiffs’ complaints were timely.
 
 Id.
 
 at 767.
 

 The Supreme Court held otherwise. According to the Supreme Court:
 

 The decision below is contrary to [our] recent decision [in]
 
 Delaware State College v. Ricks
 
 [supra, 449 U.S. 250, 101 S.Ct. 498], 66 L.Ed.2d 431 (1980) ... The Court of Appeals for the First Circuit distinguished
 
 Ricks
 
 on the ground that [the plaintiff in
 
 Ricks
 
 ] had alleged that denial of tenure was the “unlawful employment practice,” whereas here [the] respondents allege that termination of their employment as administrators was the “unlawful employment practice.” We think
 
 Ricks
 
 is indistinguishable. When [the plaintiff in
 
 Ricks
 
 ] was denied tenure, he was given a 1-year ‘terminal’ contract. Thus, in each case, the operative decision was made- and notice given-in advance of a designated date on which employment terminated.
 

 Chardon,
 
 454 U.S. at 7-8, 102 S.Ct. 28.
 

 The Court found that the complaints were time barred because the plaintiffs were notified that a final decision had been made to terminate their appointments more than one year before they filed their complaints.
 
 Id.
 
 at 8,102 S.Ct. 28.
 

 In
 
 Eastin v. Entergy Corp.,
 
 2003-1030 (La.2/6/04), 865 So.2d 49, the Louisiana Supreme Court expressly adopted the
 
 Ricks/Chardon
 
 rule in age discrimination eases. The Court noted that Louisiana appellate courts had generally chosen not to adopt the
 
 Ricks/Chardon
 
 rule upon previous consideration.
 
 See, e.g., Harris v. Home Sav. and Loan Ass’n,
 
 95-223 (La.App. 3 Cir.1995), 663 So.2d 92;
 
 Brunett v. Department of Wildlife and Fisheries,
 
 96-0535 (La.App. 1 Cir.1996), 685 So.2d 618. However, the Court found that the 112courts of appeal “have continued to erroneously rule that the damage is sustained from termination rather than from notification.”
 
 Id.
 
 at n. 3.
 
 [6]
 

 The Court concluded:
 

 In both
 
 Ricks
 
 and
 
 Chardon,
 
 the United States Supreme Court determined that suits brought more than one year from the date of notice of the termination are time barred as “the proper focus is on the time of the
 
 discriminatory act
 
 not the point at which the
 
 consequences
 
 of the act become painful.”
 
 Ricks,
 
 449 U.S. at 258, 101 S.Ct. 498, 66 L.Ed.2d 431;
 
 Chardon,
 
 454 U.S. at 8, 102 S.Ct. 28, 70 L.Ed.2d 6. Therefore, under the
 
 Ricks/Chardon
 
 analysis, prescription begins to run when the termination decision has been made and conveyed to the employee, even if the employment does not cease until a future date.
 
 Id.
 

 Id.
 
 at 54.
 

 Thus, in Louisiana, “damage is sustained in any employment discrimination case at the earlier of the date the employee is informed of his termination or his actual separation from employment.”
 
 Id.
 
 at 53-54.
 

 B. Trial Court Rulings on Exceptions of Prescription
 

 The trial court granted exceptions of prescription as to Mr. Eastin and Mr. Ruiz. The motions for summary judgment as to Mr. Eastin and Mr. Ruiz were therefore rendered moot.
 

 
 *1174
 
 C. Additional facts and analyses of Exceptions of Prescription
 

 1. Willard A. Eastin, Jr.
 

 Additional Facts
 

 The following additional facts as to Willard A. Eastin, Jr. were discerned from the hearings on Entergy’s exceptions of prescription.
 

 l,3In 1992, Mr. Eastin was employed as Entergy’s Manager of Benefits Administration. At the time of his termination, Mr. Eastin was fifty years old. In August of 1992, William Van As, Mr. Eastin’s supervisor, called Mr. Eastin into his office and told him that Entergy had “to make a change.” Mr. Van As then told Mr. Eastin that he was going to be terminated from his position at some point in the future. According to Mr. Eastin, Mr. Van As told him that the decision to replace him as Manager of Benefits Administration had already been made by Rich Landy, Mr. Van As’s supervisor. Mr. Van As indicated to Mr. Eastin that he was free to leave the department at any time if he obtained a new position in Entergy or elsewhere. Mr. Eastin expressed his desire to finish the project he was working on at that time. During his deposition, Mr. Eastin indicated that he was under the impression that if he did not find alternative employment within Entergy by the time the project was completed, he would be terminated. Ray Regan immediately replaced Mr. Eas-tin as Manager of Benefits Administration. After his conversation with Mr. Van As, Mr. Eastin took responsibility for project support in the Benefits Administration department. Mr. Eastin worked directly under Mr. Van As for several months.
 

 During his conversation with Mr. Eas-tin, Mr. Van As actively encouraged Mr. Eastin to seek other employment in Enter-gy and elsewhere. In September 1992, Mr. Eastin applied for a Benefits Manager position with Whitney Bank and wrote a letter to the Wall Street Journal in response to an employment-related advertisement. Mr. Eastin subsequently found a position with Southeast Medical Alliance. His last day of employment with Entergy was November 30,1992.
 

 By judgment dated June 16, 2008, the trial court granted Entergy’s exception of prescription and dismissed Mr. Eastin’s claims with prejudice.
 

 114Mr. Eastin filed his petition on November 29, 1993. Mr. Eastin contends that prescription on his claims began to run on November 30, 1992, his last day of employment with Entergy. Entergy contends that prescription began to run on Mr. Eastin’s claims in August 1992, when Mr. Van As informed him that he was being removed as Manager of Benefits Administration. Mr. Eastin concedes that he spoke to Mr. Van As in August 1992 and that Mr. Van As told him at that time that his position was being terminated. However, Mr. Eastin contends that prescription did not begin to run at that time because he was available for continued employment with Entergy. The Petition was filed timely if prescription began to run on November 30, 1992 but filed untimely if prescription began to run in August 1992.
 

 Analysis
 

 Prescription in Mr. Eastin’s cause of action began to run from the time of the discriminatory act, that is, when “the discriminatory decision [was] made and communicated” to him.
 
 Eastin,
 
 865 So.2d at 54. But when did Entergy “make and communicate” the termination decision to Mr. Eastin? Entergy contends that the adverse employment decision was communicated to Mr. Eastin in August 1992. Mr. Eastin contends that he was still available for employment until November 30, 1992, and that the adverse employment decision was made at that time. We have discover
 
 *1175
 
 ed no reported Louisiana cases on point. However, several cases from other jurisdictions provide guidance.
 

 In
 
 Watson v. Eastman Kodak Co.,
 
 235 F.3d 851 (3d Cir.2000), the plaintiff alleged that he was removed from his position at the Eastman Kodak Company (“Kodak”) because of unlawful race and age discrimination. On February 4, 1997, the plaintiffs supervisor sent him a letter informing him that, due to poor performance, he was retroactively removed from his position effective January 1, 1997.
 
 Id.
 
 at 853. The letter also stated that the plaintiff would be allowed to remain with Kodak beyond March 7, 1997 if he was successful in obtaining another position within the company.
 
 Id.
 
 The plaintiff failed to find another position with Kodak. Consequently, Kodak terminated his employment on March 7, 1997.
 
 Id.
 
 The defendant filed a charge with the EEOC on December 31, 1997. The district court granted Kodak’s motion for summary judgment, reasoning that the plaintiffs cause of action began to accrue on February 4, 1997 and that his EEOC charge was filed outside the statutorily allotted 300 day filing deadline.
 
 Id.
 
 at 854; 29 U.S.C. § 626(d)(1)(B).
 

 The Third Circuit affirmed. The court rejected the plaintiffs argument that his supervisor’s letter left open the possibility of continued employment in another position with Kodak.
 
 Id.
 
 at 855. The court reasoned that in
 
 Ricks,
 
 the Supreme Court “rejected an argument that the notice of termination was rendered ambiguous by the mere potential for continued employment.”
 
 Id.
 
 at 856;
 
 Ricks,
 
 449 U.S. at 260-61, 101 S.Ct. 498.
 

 Even closer to the mark is
 
 Cole v. CBS, Inc.,
 
 634 F.Supp. 1558 (S.D.N.Y.1986). In
 
 Cole,
 
 the plaintiff alleged that he was removed from his managerial position at CBS, Inc. (“CBS”) due to unlawful age discrimination. The plaintiff alleged that on June 14, 1980, his supervisor relieved him of his duties and told him that he was being replaced by a younger worker.
 
 Id.
 
 at 1560. The plaintiffs supervisor informed the
 
 Cole
 
 plaintiff that he would be stripped of his responsibilities but could remain on the payroll through April 2, 1982, which was his fifty-fifth birthday. The supervisor encouraged the plaintiff to explore possible employment in
 
 “other divisions
 
 of [CBS] in the hopes of staying with CBS past [April 2, 1982].”
 
 Id.
 
 (emphasis in original). The defendant filed a charge with the EEOC on April 13, 1982.
 
 Id.
 
 at 1561.
 

 | ifjCBS contended that the plaintiffs cause of action began to accrue on July 14, 1980, the day his supervisor informed him that his position was being terminated. The plaintiff argued that his cause of action accrued on April 2, 1982, his last day of employment.
 
 Id.
 
 The court held that the plaintiffs cause of action began to run on June 14,1980.
 
 Id.
 
 at 1562. Crucial to this holding was the finding that notice “clearly and unambiguously indicated that CBS had reached a final termination decision
 
 with respect to
 
 [the plaintiff]
 
 and his position as VP/CEO in
 
 [CBSs]
 
 Radio Division.” Id.
 
 (emphasis in original). The discriminatory act which triggered the statute of limitations was not the decision to terminate plaintiffs employment. Rather, the discriminatory act was the decision to terminate the plaintiff from his position. Thus, the Court went on to state that the “fact that CBS held out the hope that he might be able to obtain
 
 other
 
 employment at CBS did not in any way detract from the unequivocal nature of his termination from that position.”
 
 Id.
 

 In the instant case, Mr. Van As informed Mr. Eastin that he was going to be terminated from his position in August 1992 pending his reassignment to temporary work within Entergy. The notifica
 
 *1176
 
 tion Mr. Eastin received in August 1992 was phrased in unequivocal terms and was intended to be a final decision concerning Mr. Eastin’s employment as Entergy’s Plan Benefits Manager. It is of no consequence that Mr. Eastin was eligible for other employment with Entergy, nor that Entergy was attempting to place him in such employment. Prescription began to run in August 1992. The plaintiffs suit was filed on November 29, 1993, approximately fifteen months after the alleged unlawful employment practice occurred. Accordingly, Mr. Eastin’s claims are prescribed.
 

 2. Gerald Ruiz
 

 |
 
 ^Additional Facts
 

 The following additional facts as to Gerald Ruiz were discerned from the hearings on Entergy’s exceptions of prescription.
 

 In 1994, Gerald Ruiz was employed as a senior engineer’s assistant in Entergy’s Gas Operations Division. At the time of his termination, Mr. Ruiz was sixty-one years old. In early 1994, Entergy merged its Gas Operations Division with that of Gulf States Utility Company, an entity that Entergy had previously acquired. On February 3, 1994, Mr. Ruiz received a memorandum from his supervisor Michael C. Frieke. The memorandum indicated that the merged Gas Operations Division would not be able to offer Mr. Ruiz a position. As per the memorandum, Mr. Ruiz was assigned to Entergy’s “Talent Pool” and was “temporarily retained ... on a special project assignment.” Employees placed in the Talent Pool were available for immediate permanent employment with Entergy. The memorandum also indicated that Mr. Ruiz would be presented with other employment opportunities with Entergy while assigned to the Talent Pool. Mr. Ruiz signed his initials next to his printed name on the February 3 memorandum.
 

 Thereafter, Mr. Ruiz continued to work for Entergy. For several months, Mr. Ruiz taught individual Entergy employees how to correctly placard their vehicles with hazardous materials placards. He did not continue with his previous duties as a senior engineer’s assistant. On July 18, 1994, Mr. Ruiz had a conversation with Mr. Frieke. According to Mr. Ruiz, his supervisor told him “[h]ey, there’s going to be some downsizing.” Mr. Ruiz’s supervisor also told him that he was among those who were going to be downsized. No one else was present at the meeting between Mr. Ruiz and Mr. Frieke.
 

 Mr. Frieke offered Mr. Ruiz the chance to voluntarily terminate his | ^employment under the terms of Entergy’s Transition Assistance Plan (“TAP”).
 
 [7]
 
 Mr. Ruiz chose to reject the offer in favor of continuing his temporary position with Entergy. On July 18, 1994, Mr. Ruiz signed a Terminating Employee Information Sheet for Employees Who Have Elected the TAP Package. Mr. Ruiz acknowledged that he signed the Information Sheet above the line entitled “Employee Signature of Offer Reject.” During his deposition, Mr. Ruiz was asked why he signed the Information Sheet. Mr. Ruiz responded that he had to fill out the sheet because he was going to be “out-placed.” The Information Sheet indicates that Mr. Ruiz’s termination date was July 30,1994.
 

 Mr. Ruiz continued to work for Entergy on a temporary basis. Mr. Ruiz’s last day of employment with Entergy was August 31, 1995. His retirement benefits became available the next day, and he began receiving retirement benefits starting in September 1995.
 

 
 *1177
 
 By judgment dated October 14, 2008, the trial court granted Entergy’s exception of prescription and dismissed Mr. Ruiz’s claims with prejudice.
 

 Mr. Ruiz was added as a plaintiff in this case in the third supplemental and amending petition, which was filed on January 9, 1996. Entergy opines that prescription against Mr. Ruiz’s claim began to run on July 18, 1994, the date he declined to voluntarily terminate his employment and opted to continue to work for Entergy on a temporary basis. Alternatively, Entergy contends that prescription against Mr. Ruiz’s claim began to run on February 3, 1994, the date he received the memorandum from Mr. Fricke. Mr. Ruiz contends that prescription on his claims began to run on August 31, 1995, his last day of employment with Entergy. Mr. Ruiz was timely added to this suit if prescription began to run on August 31, h81995 but untimely added if prescription began to run on July 18, 1994 or February 3, 1994.
 

 Analysis
 

 On February 3, 1994, Gerald Ruiz received a memorandum indicating that the new Gas Department would not be able to offer him a position. That same memorandum assigned Mr. Ruiz to the Talent Pool. Later, Mr. Ruiz was offered the chance to voluntarily resign from En-tergy, but declined.
 

 In
 
 Bilton v. Monsanto Co.,
 
 947 F.Supp. 1344 (E.D.Mo.1996), the plaintiff was an executive at Monsanto Company (“Monsanto”). The plaintiffs supervisor informed him that his position was being eliminated when Monsanto reorganized his division.
 
 Bilton,
 
 947 F.Supp. at 1347. During the same conversation, the supervisor informed the plaintiff that he could accept early retirement, which provided enhanced retirement benefits, or reject early retirement and thereafter be involuntarily terminated with a less favorable severance package.
 
 Id.
 
 at 1348. The plaintiff eventually decided to accept early retirement after discussing the matter with other Monsanto executives.
 
 Id.
 
 at 1349. He was thereafter placed in Monsanto’s “employee pool.”
 
 Id.
 
 Employees placed in the pool were eligible for employment in any position that became available in Monsanto.
 
 Id.
 
 The plaintiff was a member of the employee pool for approximately two months.
 
 Id.
 
 at 1352.
 

 The plaintiff filed a charge of discrimination with the Georgia agency office of the EEOC 331 days after he was notified of his impending termination.
 
 Id.
 
 at 1350. He argued that because he was placed in the employee pool and remained eligible for continued employment for two months, the accrual date was the date he was no longer eligible for continued employment.
 
 Id.
 
 at 1352. The court disagreed, reasoning that the “plaintiff was notified of the elimination of his position, and the termination of his employment” upon speaking with his j ^supervisor.
 
 Id.
 
 The court specifically noted that it applied the
 
 Ricks/Chardon
 
 rule to the facts of the case.
 

 We conclude that the February 3, 1994 memorandum was intended to be a final and unambiguous decision concerning Mr. Ruiz’s employment as a senior engineer’s assistant at Entergy. That Mr. Ruiz was placed in Entergy’s Talent Pool is of no consequence. The United States Supreme Court has rejected the argument that a notice of termination was ambiguous due to the plaintiffs mere potential for continued employment.
 
 Ricks,
 
 449 U.S. at 260-61, 101 S.Ct. 498. The February 3 memorandum unambiguously informed Mr. Ruiz that Entergy would not offer him a position in its merged Gas Division. Prescription began to run that day. Mr. Ruiz became a party to this lawsuit when he was named in the plaintiffs’ third supple
 
 *1178
 
 mental and amending petition on January 9, 1996. Thus, his claims are prescribed.
 

 Mr. Ruiz additionally contends that the filing of the original petition and subsequent amendments thereto interrupted prescription of his claims. At the time this suit was filed, “the running of prescription as to putative class members was interrupted by the filing of the original petition and commenced to run anew on October 15, 1999,” the day that the trial court decertified the class.
 
 Eastin,
 
 971 So.2d at 381.
 
 See also
 
 La. C.C.P. art. 3462; La. C.C.P. art. 3463;
 
 Williams v. State of Louisiana,
 
 350 So.2d 131, 137 (La.1977) ( [S]ince the class action is brought on behalf of all members of the class, its filing interrupts prescription as to the claims of all members of the class, whether they are noticed before or after the prescriptive delay has terminated.).
 
 [8]
 
 Mr. Ruiz was not a member of the putative |21 class at the time the original petition was filed in 1993 because he was still employed by Entergy at that time.
 

 Mr. Ruiz was first eligible to become a member of the class on February 3, 1994, after the original petition was filed. The plaintiffs’ second supplemental and amending petition was filed on August 11, 1995.
 
 [9]
 
 At that point, Mr. Ruiz’s claims were already prescribed. We find nothing in Louisiana jurisprudence, and the plaintiffs cite to none, to suggest that a plaintiff may revive a prescribed action by adding himself to an already-filed class action.
 

 For the reasons described, the trial court was not manifestly erroneous in granting Entergy’s exception of prescription as to Mr. Ruiz.
 

 III. GRANTS OF SUMMARY JUDGMENT
 

 Having analyzed Mr. Eastin’s and Mr. Ruiz’s claims, we now turn to the remaining plaintiffs. The trial court granted En-tergy’s motions for summary judgment as to each of the remaining six plaintiffs in this case.
 

 A. Summary Judgment Generally
 

 Typically, in a Louisiana summary judgment case, the movant has the burden of showing that there exists no genuine issue as to material fact. La. C.C.P. arts. 966(B); 966(C)(2). If the burden is met, the movant is entitled to judgment as a matter of law. Appellate courts review summary judgments
 
 de novo
 
 using the same criteria applied by the district court in order to determine whether the grant of summary judgment was appropriate.
 
 Skidmore v. Initial DSI Transport, Inc.,
 
 99-1066 (La.App. 5 Cir. 2/29/00), 757 So.2d 107, 108.
 

 At the respective times set forth below that Mr. Frost, Mr. Ohlmeyer, Ms. lagPorrovecchio, Ms. Boudreaux, and Mr. Canzoneri were terminated from Entergy, LCHRA provided as follows:
 

 A. It is the purpose and intent of the legislature by this enactment to provide
 
 *1179
 
 for execution within Louisiana of the policies embodied in the Federal Civil Rights Act of 1964, 1968, and 1972 and the Age Discrimination in Employment Act of 1967, as amended; and to assure that Louisiana has appropriate legislation prohibiting discrimination in public accommodations sufficient to justify the deferral of cases by the federal Equal Employment Opportunity Commission, the secretary of labor, and the Department of Justice under those statutes; to safeguard all individuals within the state from discrimination because of race, creed, col- or, religion, sex, [or] age.
 

 B. The prohibitions in this Chapter against discrimination because of age in connection with public accommodations shall be limited to individuals who are at least forty years of age.
 

 La. R.S. 51:2231 (emphasis added).
 

 In Acts 1993, No. 820 § 9, the legislature amended LCHRA to include protection from discrimination based on disability and removed the protection from discrimination based on national origin. Acts 1993, No. 820 was approved on June 22, 1993. Mr. Hickman was terminated in November, 1994. Thus, the amended version of LCHRA was in effect at the time Mr. Hickman was terminated from employment at Entergy. However, the pertinent portion of LCHRA safeguarding Louisiana citizens from age discrimination remained unchanged.
 

 At the time of Entergy’s alleged discrimination against the plaintiffs, LCHRA further provided “[i]t shall be a discriminatory practice for an employer ... [t]o fail, to refuse to hire, or to discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of the individual’s ... age.” La. R.S. 51:2242(A)(1) (1996). In Acts 1997, No. 1409, § 1, the legislature consolidated various Louisiana discrimination statutes into one comprehensive chapter.
 
 See
 
 La. R.S. 23:301, Historical and Statutory Notes. La. R.S. 51:2242(A)(1) was reenacted as La. R.S. 23:312(A)(1). La. R.S. 23:312(A)(1) currently provides that it is 1 ^unlawful for an employer to “[flail or refuse to hire, or to discharge, any individual or otherwise discriminate against any individual with respect to his compensation, or his terms, conditions, or privileges of employment because of the individual’s age.” The Age Discrimination in Employment Act of 1967 (“ADEA”), the federal statute prohibiting age discrimination, contains virtually the same language as La. R.S. 23:312(A)(1).
 
 See
 
 29 U.S.C. § 623(a)(1). Thus, Louisiana courts routinely look to federal jurisprudence to interpret Louisiana discrimination laws as they are derived from federal law.
 
 See, e.g., Lee v. Constar, Inc.,
 
 05-633 (La.App. 5 Cir. 2/14/06), 921 So.2d 1240, 1246,
 
 writ denied,
 
 06-880 (La.6/2/06) 929 So.2d 1263.
 

 B. Disparate Impact/Disparate Treatment
 

 Age discrimination claims may be based on the disparate impact on a protected class of employees or on the disparate treatment of a particular employee.
 
 See, e.g., Raytheon Co. v. Hernanez,
 
 540 U.S. 44, 52,124 S.Ct. 513, 519, 157 L.Ed.2d 357 (2003).
 

 In a disparate impact age discrimination case, the plaintiff seeks to show that a facially neutral practice has a statistically greater impact on employees between 40 and 70 years of age as opposed to other members of the employer’s workforce and that the adverse impact on older workers cannot be justified by business necessity.
 
 Id.
 
 Put differently, “in the typical disparate-impact ease, the employer’s
 
 *1180
 
 practice is without respect to age and its adverse impact ... is attributable to a nonage factor; so action based on a factor other than age is the very premise for disparate-impact liability in the first place, not a negation of it or a defense to it.”
 
 Meacham v. Knolls Atomic Power Laboratory,
 
 554 U.S. 84, 128 S.Ct. 2395, 2403, 171 L.Ed.2d 283 (2008) (quoting
 
 Smith v. City of Jackson,
 
 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005)) (internal quotations omitted). In a disparate impact Incase, the plaintiff need not show that the defendant intended to discriminate, rather, the plaintiff must show a disproportionately adverse effect on a protected group.
 
 See, e.g., Pacheco v. Mineta,
 
 448 F.3d 783, 787 (5th Cir.2006). In order to prove a prima facie case of disparate impact, the plaintiff must make “a threshold showing of a significant statistical disparity” between employees aged 40 through 70 and the balance of the employer’s workforce.
 
 Ricci v. DeStefano,
 
 — U.S. -, 129 S.Ct. 2658, 2678, 174 L.Ed.2d 490 (2009).
 

 To prevail in a disparate impact case, the employee’s claim must be supported by statistics comparing workers age 40 to 70 with the balance of the employer’s workforce, not the general population.
 
 Crawford v. U.S. Dept. of Homeland Security,
 
 245 Fed.Appx. 369, 379 (unpublished) (5th Cir.2007) (citing
 
 Banks v. E. Baton Rouge Parish Sch. Bd.,
 
 320 F.3d 570, 579 (5th Cir.2003));
 
 see also Hazelwood Sch. Dist. v. United States,
 
 433 U.S. 299, 309, n. 13, 97 S.Ct. 2736, 2742, n. 13, 53 L.Ed.2d 768 (1977) (noting “[wjhen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.”).
 

 In
 
 Smith v. City of Jackson, Miss.,
 
 544 U.S. 228, 240, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005), the United States Supreme Court stated unequivocally that recovery is available under the ADEA to plaintiffs who raise discrimination claims based on a theory of disparate impact. However, the Supreme Court also noted “the scope of disparate-impact liability under [the] ADEA is narrower than under Title VII.”
 
 Id.
 
 Plaintiffs who allege discrimination based on a theory of disparate impact under the ADEA must “isolate and identify the
 
 specific
 
 employment practices that are allegedly responsible for any observed statistical disparities.”
 
 Meacham,
 
 128 S.Ct. at 2405-06 (emphasis in the original). For example, in
 
 City afyJackson,
 
 the Supreme Court held that the petitioners had not raised a genuine issue of material fact because they:
 

 [H]ave done little more than point out that the pay plan at issue is relatively less generous to older workers than to younger workers. They have not identified any specific test, requirement, or practice ... that has an adverse impact on older workers. As we held in
 
 Wards Cove,
 
 it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is responsible for isolating and identifying the
 
 specific
 
 employment practices that are allegedly responsible for any observed statistical disparities. Petitioners have failed to do so. Their failure to identify the specific practice being challenged is the sort of omission that could result in employers being potentially liable for the myriad of innocent causes that may lead to statistical imbalances.
 

 City of Jackson,
 
 544 U.S. at 241, 125 S.Ct. 1536, 161 L.Ed.2d 410 (emphasis in the original) (internal citations omitted).
 

 In disparate treatment cases, the employee seeks to prove that the employer has treated him or her less favor
 
 *1181
 
 ably because of his race, color, religion, sex, national origin, or other protected status. Disparate treatment cases in age discrimination claims are based on the text of the ADEA, which pertinently provides that it is unlawful to discriminate against an individual “with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s age.” 29 U.S.C. § 623(a)(1). In a disparate treatment case, liability depends on whether the protected trait (in this case, age) actually motivated the employer’s decision.
 
 See, e.g., Hernandez,
 
 540 U.S. at 52, 124 S.Ct. 513. Moreover, unlike in disparate impact cases, in disparate treatment age discrimination cases, proof of discriminatory motive is critical. However, a discriminatory motive “can in some situations be inferred from the mere fact of differential treatment.”
 
 Hazen Paper Co.,
 
 507 U.S. at 609, 113 S.Ct. 1701 (citing
 
 Teamsters v. United States,
 
 431 U.S. 324, 335-336, n. 15, 97 S.Ct. 1843, 1855, n. 15, 52 L.Ed.2d 396 (1977) (construing Title VII of Civil Rights Act of 1964)).
 

 |2p>C. Direct Evidence in Disparate Treatment Cases
 

 As to their disparate treatment claims, the plaintiffs contend that they have presented this court with “direct evidence of discrimination.” The plaintiffs contend that Mr. Lupberger’s aforementioned comments, Entergy’s destruction of documents indicating that it was intentionally discriminating against its older employees, and two statistical reports generated by Dr. W. Allen Watson are direct evidence of age discrimination.
 

 Comments by supervisors and executives may serve as sufficient evidence of age discrimination if the comments are: 1) age related; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.
 
 Brown v. CSC Logic, Inc.,
 
 82 F.3d 651, 655 (5th Cir.1996). Comments that are “vague and remote in time” are insufficient to establish discrimination.
 
 Guthrie v. Tifco Industries,
 
 941 F.2d 374 (5th Cir.1991),
 
 cert. denied,
 
 503 U.S. 908, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992) (citing
 
 Normand v. Research Institute of America, Inc.,
 
 927 F.2d 857, 864, n. 3 (5th Cir.1991)). Moreover, “stray remarks” do not demonstrate age discrimination.
 
 See, e.g., Waggoner v. City of Garland,
 
 987 F.2d 1160, 1166 (5th Cir.1993) (a statement by a decision maker that an employee was an “old _” and that a younger person could complete his work faster was a stray remark insufficient to establish age discrimination). In contrast, specific comments made over a lengthy period of time are sufficient to constitute direct evidence of age discrimination.
 
 Brown,
 
 82 F.3d at 655-56.
 

 Before the United States Supreme Court’s decision in
 
 Gross v. FBL Financial Services, Inc.,
 
 — U.S. -, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009), jurisprudence interpreting federal statutes applied a different analytical framework in cases where the plaintiff presents direct evidence of discrimination than the 127framework applied in those cases where the plaintiff presents circumstantial evidence of discrimination. Prior to
 
 Gross,
 
 various federal courts of appeal and state courts had held that when a plaintiff was able to provide direct evidence that age played a motivating part in the adverse employment decision, the mixed-motives burden-shifting standard of
 
 Price Waterhouse v. Hopkins,
 
 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) applied to the plaintiffs claims. In
 
 Price Waterhouse,
 
 the Supreme Court established in the context of a Title VII discrimination case that a plaintiff could show that discrimination
 
 *1182
 
 was because of an impermissible factor by showing that factor to be a motivating factor in the employers decision.
 
 Price Waterhouse,
 
 490 U.S. at 244-45, 109 S.Ct. 1775. Once the plaintiff made that showing, the Supreme Court held that the burden of persuasion shifted to the defendant, who could avoid liability by showing by a preponderance of evidence that it would have taken the same employment action even without consideration of the prohibited factor.
 
 Id.
 

 In
 
 Gross,
 
 the United States Supreme Court held that the
 
 Price Waterhouse
 
 mixed-motive analysis did not apply to ADEA cases. In
 
 Gross,
 
 the Court held that in age discrimination cases, the plaintiff must establish by a preponderance of the evidence that age was the “but for” reason the employer took the adverse action, rather than simply a motivating factor.
 
 Gross,
 
 129 S.Ct. at 2350. The
 
 Gross
 
 plaintiff contended that he had been demoted because of his age.
 
 Id.
 
 at 2344. At the close of trial, and over the defendant’s objections, the trial court instructed the jury to enter a verdict for the plaintiff if it found that he had proved, by a preponderance of evidence, that he was demoted and his age was a motivating factor in the demotion decision. The trial court further instructed the jury that age was a motivating factor if it played a part in the demotion. The trial court also instructed the jury to return a verdict for the defendant if it found that the defendant | ^proved that it would have demoted the plaintiff regardless of age.
 
 Id.
 

 The question presented to the United States Supreme Court in
 
 Gross
 
 was “whether a plaintiff must present direct evidence of age discrimination in order to obtain a mixed-motives jury instruction in a suit brought under [ADEA].”
 
 Id.
 
 The Court, however, directed itself to the threshold question; could age be “a” factor rather than “the” factor in an age discrimination case? The Court said no. It reasoned that its burden shifting framework enunciated for mixed-motive Title VII claims in
 
 Price Waterhouse
 
 did not apply to ADEA claims. “Unlike Title VTI, the ADEA’s text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor.”
 
 Gross,
 
 129 S.Ct. at 2349.
 

 The Court ultimately held that to “establish a disparate-treatment claim under the plain language of the ADEA ... a plaintiff must prove that age was the ‘but-for’ cause of the employer’s adverse decision.”
 
 Id.
 
 at 2350. The Supreme Court further instructed that there is no “heightened evidentiary requirement” for plaintiffs to satisfy their burden of persuasion through “direct evidence” as opposed to “circumstantial evidence.”
 
 Id.
 
 at 2351, n. 4. The rule is simply that “[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the ‘but-for’ cause of the challenged employer decision.”
 
 Id.
 

 The nature of the analysis in disparate treatment cases where the plaintiff has presented direct evidence of discrimination following the
 
 Gross
 
 opinion is unclear. In this case, however, we need not address that issue, because we find that these plaintiffs have not presented direct evidence of discrimination.
 

 D. The Question of Direct Evidence in This Case
 

 The plaintiffs contend that Mr. Lupberger’s comments in 1992 and 1993 12¡)Constitute direct evidence of discrimination. We hold that Mr. Lupberger’s comments do not for three reasons. First, there is no indication in the record that Mr. Lupberger’s comments related to any supervisor’s decision not to hire, to demote, or to terminate any of the plaintiffs
 
 *1183
 
 in question. Put differently, there is no indication that any of the plaintiffs in question were not offered a position, were demoted, or terminated as a result of Mr. Lupberger’s comments. Second, Mr. Lup-berger had no direct authority over the employment decisions at issue. Mr. Lup-berger was not hired to lead or supervise any of the departments that employed any of the plaintiffs at issue; rather, he was the chief executive officer of the company. Finally, Mr. Lupberger’s comments were too vague to constitute direct evidence of discrimination.
 

 In
 
 Wyvill v. United Companies Life Ins. Co.,
 
 212 F.3d 296 (5th Cir.2000), the plaintiffs attempted to rely on several age-related comments made by the defendant’s chief executive officer as proof of direct evidence of discrimination. One of the defendant’s former employees testified that the chief executive officer “told him that he wanted the company to be mean and lean, and he wanted to go to a young, aggressive group of people.”
 
 Id.
 
 at 304. The employee further testified that the chief executive officer generally wanted to “get rid of the people that were [employed by the defendant] so that we can make more money, be more aggressive, more productive.”
 
 Id.
 
 Another employee testified that that the chief executive officer “wished [the older men in corporate headquarters] would go away so that [the chief executive] could get some new blood in the company.”
 
 Id.
 
 The U.S. Fifth Circuit held that these comments were not sufficient to constitute direct evidence of discrimination. The court noted that “[i]n order for an age-based comment to be probative of an employer’s discriminatory intent, it must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences lsnor presumptions that age was a determinative factor in the decision to terminate the employee.”
 
 Id.
 
 (citing
 
 Equal Employment Opportunity Commission v. Texas Instruments, Inc.,
 
 100 F.3d 1173, 1181 (5th Cir.1996)). The court ultimately concluded that the chief executive’s remarks were “neither direct and unambiguous, nor were they tied to a time frame relevant to this case. These remarks were not probative on the ultimate question of age discrimination against [the defendants].”
 
 Id.
 
 As the U.S. Fifth Circuit concluded in
 
 Wyvill,
 
 we find that the remarks in the instant case were not direct or unambiguous.
 

 The plaintiffs rely on
 
 Woodhouse v. Magnolia Hosp.,
 
 92 F.3d 248 (5th Cir. 1996) for the proposition that a single remark can constitute direct evidence of discrimination. This proposition is indeed true. However, in
 
 Woodhouse,
 
 the defendant’s chairman explicitly told an employee that the defendant hospital was going to “lay off older employees.”
 
 Id.
 
 at 253. The
 
 Woodhouse
 
 comments were direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was a determinative factor in the decision to terminate the employee. Such is not the case here; accordingly, we do not find
 
 Woodhouse
 
 persuasive.
 

 The plaintiffs also contend that Entergy executives destroyed relevant documents and that this is direct evidence of discrimination. However, there is no indication in the record that Entergy destroyed documents which pertained to any of the plaintiffs. Therefore, the destroyed documents do not constitute direct evidence of discrimination as to these plaintiffs. The plaintiffs also contend that two statistical reports generated by Dr. W. Allen Watson are direct evidence of discrimination.
 
 [10]
 
 In
 
 *1184
 
 the first report, Dr. Watson concluded that older employees at |31 Entergy were statistically more likely to be terminated than their younger counterparts. In the second report, Dr. Watson analyzed an allegedly discriminatory Entergy employee evaluation system entitled the Management Planning and Review Ranking Process.
 

 A plaintiff must show “disparate treatment between comparable individuals.”
 
 Id.
 
 (citing
 
 Cone v. Longmont United Hosp. Ass’n,
 
 14 F.3d 526, 532 (10th Cir.1994)) (emphasis in the original). Here, the first report generated by Dr. Watson is irrelevant to the plaintiffs’ claims because it only analyzed Entergy employees who were terminated between September 1, 1992 and January 1, 1993. All of these plaintiffs were terminated after January 1, 1993. Thus, the individuals analyzed in Dr. Watson’s first report are not comparable to these plaintiffs. Moreover, as Dr. Watson admitted in his report, the only complete set of data analyzed was from Entergy’s fossil operations division, which did not employ any of these plaintiffs. The second report generated by Dr. Watson is similarly irrelevant to these plaintiffs’ claims because the Management Planning and Review Ranking Process was not instituted until after these plaintiffs had left Entergy.
 

 We have carefully examined the entire record and relevant evidence for direct evidence of discrimination. We conclude that there is no direct evidence of discrimination in the record as to any of these plaintiffs. Having found that there is no direct evidence of discrimination in this case, the next question we must answer is: does the
 
 McDonnell Douglas
 
 framework continue to apply to the analysis of ADEA cases where a plaintiff presents circumstantial evidence of discrimination on summary judgment? We say yes.
 

 |S2E. The “McDonnell Douglas Framework”: Circumstantial Evidence of Discrimination
 

 Considering the difficulty an ADEA plaintiff faces in producing direct evidence of discriminatory intent, courts have adopted a three-step evidentiary procedure in disparate treatment ADEA cases based on circumstantial evidence.
 
 Bodenheimer v. PPG Indus,, Inc.,
 
 5 F.3d 955, 957 (5th Cir.1993).
 
 [11]
 
 This three-step evi-dentiary procedure was originally developed for Title VII plaintiffs in
 
 McDonnell Douglas Corp. v. Green,
 
 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, 678 (1973).
 
 [12]
 
 
 *1185
 
 The United States Supreme Court first utilized the
 
 McDonnell Douglas
 
 framework in an ADEA case in
 
 Trans World Airlines, Inc. v. Thurston,
 
 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).
 

 In the
 
 McDonnell Douglas
 
 framework, the plaintiff claiming discrimination must first establish a prima facie case of discrimination. If the plaintiff establishes a prima facie case, the defendant must then articulate a legitimate nondiscriminatory reason for its action. If the defendant articulates such a reason, an ADEA plaintiff must then show by a preponderance of the evidence that the defendant’s reason is mere pretext for discrimination.
 
 Reeves v. Sanderson Plumbing Products, Inc.,
 
 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).
 

 Prior to
 
 Gross,
 
 the U.S. Fifth Circuit consistently held that the
 
 McDonnell Douglas
 
 framework applied to ADEA cases.
 
 See, e.g., Sandstad,
 
 309 F.3d at n. 2 (citing
 
 Russell v. McKinney Hospital Venture,
 
 235 F.3d 219, 222, n. 3 (5th Cir.2000)). Post-Gross, the U.S. Fifth Circuit has determined, consistent with the vast majority of other federal circuits which have addressed the question, that the |
 
 ^McDonnell Douglas
 
 framework still applies to ADEA cases in the wake of
 
 Gross.
 
 In
 
 Cervantez v. KMGP Services Co. Inc.,
 
 349 Fed.Appx. 4 (5th Cir.2009) (unpublished per curiam), the U.S. Fifth Circuit noted:
 

 The Supreme Court’s recent decision in
 
 Gross
 
 rejected the application of Title VIPs ‘motivating factor’ standard to ADEA mixed-motive cases. That holding has no affect on today’s analysis because, on appeal, [the plaintiff] did not advance a motivating-factor theory ... As [the plaintiffs] ADEA claim is based on circumstantial evidence, the burden-shifting framework of
 
 McDonnell Douglas Corp. v. Green
 
 applies.
 

 Id.
 
 at n. 7.
 

 See also Velez v. Thermo King de Puero Rico, Inc.,
 
 585 F.3d 441, 446-447 (1st Cir.2009) (holding that the
 
 McDonnell Douglas
 
 framework still applies to ADEA cases post-Gross);
 
 Smith v. City of Allentown,
 
 589 F.3d 684, 690-691 (3d Cir.2009) (same);
 
 Baker v. Silver Oak Senior Living Management Co., L.C.,
 
 581 F.3d 684, 688 (8th Cir.2009) (same).
 

 The
 
 Gross
 
 Court did not explicitly address whether the
 
 McDonnell Douglas
 
 evi-dentiary framework applies when an ADEA plaintiff presents circumstantial evidence of discrimination on summary judgment, as is the case here. Indeed, the Supreme Court explicitly noted in
 
 Gross
 
 that “[it] has not definitively decided whether the evidentiary framework of
 
 McDonnell Douglas ...
 
 utilized in Title VII cases is appropriate in the ADEA context.”
 
 Gross,
 
 129 S.Ct. at 2349, n. 2. We recognize that the Supreme Court’s opinion in
 
 Gross
 
 could be interpreted as looking askance at the use of the
 
 McDonnell Douglas
 
 framework in ADEA cases. However, given that the U.S. Fifth Circuit and the overwhelming majority of federal circuits have found that the
 
 McDonnell Douglas
 
 framework still applies to ADEA cases, we adopt that proposition here.
 

 In the
 
 McDonnell Douglas
 
 framework, an ADEA plaintiff first must establish a prima facie case by a preponderance of the evidence.
 
 See, e.g., Swierkiewicz v. Sorema N. A.,
 
 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (applying standard to Title VII and ADEA claims). A prima facie case of employment discrimination based on age requires a showing that (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge or demotion; and (4) he was either i) replaced by someone outside the protected class, ii)
 
 *1186
 
 replaced by someone younger, or iii) otherwise discharged because of his age.
 
 See Machinchick v. PB Power, Inc.,
 
 398 F.3d 345, 350 (5th Cir.2005);
 
 McDonnell Douglas,
 
 411 U.S. at 802, 93 S.Ct. at 1824. The prima facie case raises an inference of unlawful discrimination once established.
 
 See Rhodes v. Guiberson Oil Tools,
 
 75 F.3d 989, 992 (5th Cir.1996),
 
 abrogated on other grounds
 
 by
 
 Reeves v. Sanderson Plumbing Products, Inc.,
 
 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).
 

 In
 
 O’Connor v. Consolidated Coin,
 
 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), the Supreme Court held that, assuming that the
 
 McDonnell Douglas
 
 framework applied to ADEA cases, an employee only satisfies the fourth prong of the
 
 McDonnell Douglas
 
 prima facie case when he is replaced by an employee significantly younger. Age differences of ten or more years have generally been held to be sufficiently substantial to meet the requirement of the fourth prong of an age discrimination prima facie case.
 
 See, e.g., Hollander v. Am. Cyanamid Co.,
 
 172 F.3d 192, 199 (2d Cir.1999),
 
 cert. denied,
 
 528 U.S. 965, 120 S.Ct. 399, 145 L.Ed.2d 311 (1999),
 
 abrogated on other grounds
 
 by
 
 Schnabel v. Abramson,
 
 232 F.3d 83 (2d Cir.2000) (transfer of duties from 58-year old to two other employees, one 11 years and one 8 months younger, sufficient);
 
 Barnett v. Dep’t of Veterans Affairs,
 
 153 F.3d 338, 340, 341, n. 3 (6th Cir.1998),
 
 cert. denied,
 
 525 U.S. 1106, 119 S.Ct. 875, 142 L.Ed.2d 775 (1999) (replacement of 51-year old by employee “around 40” sufficient). On the contrary, age differences of less than ten years have often been held to be not significant |SBenough to make out the fourth prong of a
 
 McDonnell Douglas
 
 prima facie case.
 
 See, e.g., Earle v. Aramark Corp.,
 
 247 Fed.Appx. 519, 523 (5th Cir.2007) (unreported) (noting that four years is an “insignificant age difference that is not sufficient to support a prima facie case of age discrimination.”);
 
 Girten v. McRentals,
 
 337 F.3d 979, 981 (8th Cir. 2003) (stating that replacement of 63-year old by 54-year old may be insufficient);
 
 Radue v. Kimberly-Clark Corp.,
 
 219 F.3d 612, 619 (7th Cir.2000) (termination of 53-year old while retaining 46-year old and 44-year old, without more, insufficient),
 
 called into doubt on other grounds
 
 by
 
 Sanghvi v. St. Catherine’s Hosp., Inc.,
 
 258 F.3d 570, 574 (7th Cir.2001).
 

 If the plaintiff succeeds in proving the prima facie case, the defendant must come forth “to articulate "some legitimate, nondiscriminatory reason for the employee’s rejection.”
 
 Texas Dept. of Community Affairs v. Burdine,
 
 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting
 
 McDonnell Douglas,
 
 411 U.S. at 802, 93 S.Ct. 1817). The defendant’s burden, in rebutting a prima facie case, is one of production, not persuasion.
 
 See id.
 
 at 254, 101 S.Ct. 1089.
 

 Should the defendant come forth with some nondiscriminatory reasons in rebuttal of the plaintiffs prima facie case, the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.
 
 Id.
 
 at 253, 101 S.Ct. 1089. This may be accomplished either directly, by showing that a discriminatory reason more than likely motivated the employer, or indirectly) by showing that the asserted reason is unworthy of credence.
 
 Id.
 
 at 256, 93 S.Ct. 1817.
 

 The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.
 
 Id.
 
 at 253, 93 S.Ct. 1817. Evidence demonstrating the falsity of the defendant’s explanation, taken together with the prima facie case, is likely to support an
 
 *1187
 
 [¡(¡inference of discrimination even without further evidence of defendant’s true motive.
 
 Sandstad,
 
 309 F.3d at 897. Thus, the plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer’s discriminatory animus or the falsity of the employer’s legitimate nondiscriminatory explanation.
 
 Id.
 

 F. McDonnell Douglas Reduction in Force Cases
 

 In many cases, ADEA plaintiffs have attempted to show that they were discriminated against during company-wide layoffs. Courts refer to these cases as “reduction in force” or “RIF” cases. The U.S. Fifth Circuit has observed that “what is suspicious in reduction-in-foree cases is that the employer fired a qualified, older employee but retained younger ones.”
 
 Woodhouse v. Magnolia Hosp.,
 
 92 F.3d 248, 253 (5th Cir.1996).
 

 In a reduction in force case, a plaintiff makes out a prima facie case under
 
 McDonnell Douglas
 
 by showing (1) that he is within the protected age group; (2) that he has been adversely affected by the employer’s decision; (3) that he was qualified to assume another position at the time of the discharge; and (4) by producing evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.
 
 Nichols v. Loral Vought Systems Corp.,
 
 81 F.3d 38, 41 (5th Cir.1996). An employer’s conscious, unexplained departure from its usual polices and procedures when conducting a RIF may in appropriate circumstances support an inference of age discrimination if the plaintiff establishes some nexus between employment actions and the plaintiffs age.
 
 See EEOC v. Texas Instruments,
 
 100 F.3d 1173, 1182 (5th Cir. 1996),
 
 called into doubt on other grounds
 
 by
 
 Thompson v. Origin Technology In Business, Inc.,
 
 2001 WL 1018748 (N.D.Tex.2001) |S7(unreported).
 

 The defendant must then assert a legitimate, nondiscriminatory reason for the discharge or demotion. In the context of a reduction in force, which is itself a legitimate, nondiscriminatory reason for discharge, the fact that an employee is qualified for his job is less relevant because some employees may have to be terminated despite competent performance.
 
 Barber v. Shaw Group, Inc.,
 
 243 Fed.Appx. 810, 811 (5th Cir.2007) (per curiam) (citing
 
 Texas Instruments,
 
 100 F.3d at 1181). If, however, the older employee shows that he was terminated in favor of younger, clearly less qualified individuals, a genuine, material fact issue exists.
 
 Texas Instruments,
 
 100 F.3d at 1181.
 

 As in non-RIF cases, after an employer establishes a legitimate, nondiscriminatory reason for the reduction, a plaintiff must, pursuant to his ultimate burden of proof on the issue of intentional discrimination, demonstrate a genuine issue of material fact on whether the reason for termination presented by the employer is merely a pretext for discrimination or is only one of the reasons for its action.
 
 Barber,
 
 243 Fed.Appx at 811-12 (citing
 
 Rachid v. Jack In The Box, Inc.,
 
 376 F.3d 305, 312 (5th Cir.2004)).
 
 [13]
 

 G. Analysis: Did the Plaintiffs Establish Claims for Disparate Impact?
 

 The plaintiffs contend that under the facts presented, they have “established a
 
 *1188
 
 claim for disparate impact” pursuant to
 
 Meacham v. Knolls Atomic Power Laboratory,
 
 554 U.S. 84, 128 S.Ct. 2895, 171 L.Ed.2d 283 (2008).
 

 The parties dispute the application of
 
 Meacham
 
 to this case. The plaintiffs contend that the
 
 Meacham
 
 Court held that when an application of “subjective” | ^criteria such as “performance, flexibility, and critical skills” result in a termination of a disproportionate number of older workers, the burden of persuasion shifts to the defendant to show that its decisions were reasonable. Entergy contends that the
 
 Meacham
 
 Court merely held that the “Reasonable Factors Other Than Age” (RFOA) exemption contained in the ADEA is an affirmative defense on which the employer bears the burden of persuasion.
 
 [14]
 

 The question presented by
 
 Meacham
 
 was “whether an employer facing a disparate-impact claim and planning to defend on the basis of RFOA must not only produce evidence raising the defense, but also persuade the factfinder of its merit.”
 
 Id.
 
 at 2398. The
 
 Meacham
 
 defendant was a laboratory engaged in the production of nuclear reactors for submarines.
 
 Id.
 
 The defendant was compelled to cut its workforce when the demand for nuclear reactors waned after the Cold War.
 
 Id.
 
 The defendant terminated approximately 143 positions.
 
 Id.
 
 at n. 1. In order to determine which employees would be terminated, managers scored employees on “performance,” “flexibility,” and “critical skills” in order to determine which employees would be laid off.
 
 Id.
 
 at 2398. The
 
 Meac-ham
 
 plaintiffs argued that this facially neutral method of evaluation had a disparate impact on ADEA-protected employees.
 
 Id.
 
 To prove that there was a disparate impact, the plaintiffs used statistical evidence to show that the scores for which managers had the most discretionary judgment were the most skewed according to age.
 
 Id.
 
 at 2395.
 

 The Supreme Court began its analysis by discussing
 
 City of Jackson
 
 and
 
 Wards Cove Packing Co. v. Atonio,
 
 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989),
 
 superseded by statute on other grounds,
 
 Civil Rights Act of 1991, § 105, 105 Stat. 1074-1075, 42 U.S.C. § 2000e-2(k). The Supreme Court explained that court of appeals had placed the burden of persuasion in an RFOA defense on|S9the plaintiff.
 
 Id.
 
 at 2404. In its opinion, the court of appeal had done so because the Supreme Court had placed the burden of persuasion in the so-called “business necessity” inquiry on the plaintiff in
 
 Wards Cove.
 

 [15]
 

 Id.
 
 The Supreme Court ultimately concluded that the court of appeals erred and that the RFOA defense is an affirmative defense on which the employer bears the burden of persuasion.
 
 See generally id.
 
 at 2400-02.
 

 The Supreme Court agreed that
 
 City of Jackson
 
 relied on
 
 Wards Cove
 
 for the proposition that an ADEA plaintiff must point “to a generalized policy that leads to such an impact.”
 
 Id.
 
 at 2405 (citing
 
 City of Jackson,
 
 544 U.S. at 241, 125 S.Ct. 1536). The Court also reaffirmed the
 
 *1189
 

 Wards Cove
 
 proposition that “the plaintiff is obliged to ... isolatfe] and identif[y] the
 
 specific
 
 employment practices that are allegedly responsible for any observed statistical disparities.”
 
 Id.
 
 (quoting
 
 Wards Cove,
 
 490 U.S. at 656, 109 S.Ct. 2115) (emphasis in original; internal quotation marks omitted). Moreover, the court stressed that “[¿Identifying a specific practice is not a trivial burden.”
 
 Id.
 
 at 2406. The Court did not address the second portion of the
 
 Wards Cove
 
 analysis, which shifts the burden of production to the employer to articulate a legitimate business justification for the use of the challenged practices after the plaintiff points to specific employment practices which result in statistical disparities.
 
 Wards Cove,
 
 490 U.S at 658, 109 S.Ct. 2115.
 
 [16]
 

 Based on the foregoing, we cannot agree with the plaintiffs’ reading of
 
 Meacham.
 
 The essential holding of
 
 Meacham
 
 is that the RFOA exemption 140contained in ADEA creates an affirmative defense, for which the burden of persuasion falls on the employer.
 
 Id.
 
 at 2401-02. The plaintiffs are correct in their assertion that there was an element of subjectivity in the evaluation process at issue in
 
 Meacham.
 
 However, “subjective decision making” [sic] was not the specific employment practice evaluated for disparate impact. The specific employment practice pointed to by the plaintiffs in their claim was a matrix and scoring system based on “performance,” “flexibility,” and “critical skills.”
 
 Id.
 
 at n. 2;
 
 see also Meacham v. Knolls Atomic Power Laboratory,
 
 461 F.3d 134, 138 (2d Cir.2006),
 
 vacated
 
 by
 
 Meacham v. Knolls Atomic Power Laboratory,
 
 554 U.S. 84, 128 S.Ct. 2395, 171 L.Ed.2d 283 (2008) (explaining how managers were instructed to list all employees under their supervision on a matrix and to rank all employees in various skills).
 

 In the instant case, the plaintiffs have not pointed to a specific employment practice to support their disparate impact claims. On the contrary, the plaintiffs acknowledge that Entergy’s proffered reasons for terminating ADEA-protected employees were “subjective evaluation of employees’ performance and adaptability.” The plaintiffs’ vague claims of subjective decision-making cannot be considered a specific test or requirement. Since we find that the defendants have not pointed to a specific test or requirement, the plaintiffs have not borne their initial burden. Therefore, we need not determine whether Entergy has asserted a legitimate business justification for its actions in this case.
 

 Moreover, in their various petitions, the plaintiffs allege that they “were terminated because of their age.” Thus, the plaintiffs have essentially alleged that they were intentionally discriminated against, which is the hallmark of a disparate treatment claim.
 
 See also Senner v. Northcentral Technical Coll.,
 
 113 F.3d 750, 757 (7th Cir.1997) (“[disparate treatment occurs when an employer, with actual | ^discriminatory intent, treats an employee (or applicant) unfavorably ... Disparate impact, on the other hand, does not require intentional discrimination. It occurs where a specified employment practice, although neutral on its face, has a
 
 *1190
 
 disproportionally negative effect on members of a legally protected class.”) (citation and internal quotations omitted). We hold that the plaintiffs’ allegations have failed to make out a disparate impact claim in this case.
 

 H. Additional Facts Common to All Remaining Plaintiffs
 

 The plaintiffs have asserted claims under the LCHRA, La. R.S. 51:2231
 
 et seq.
 

 In their original petition, the plaintiffs asserted the following: (1) they were all employees of Entergy discharged at various times during 1992 and 1993, (2) when they were discharged, they were all between forty and seventy years of age, (3) they were discriminated against systematically in favor of younger, equivalently less experienced employees in violation of LCHRA, and (4) they were damaged as a result.
 

 All of the plaintiffs assert age discrimination claims based on disparate impact and disparate treatment theories. All of the plaintiffs contend that they have presented this Court with direct and circumstantial evidence of Entergy’s discrimination.
 

 We have previously explained that former Entergy chief executive officer Edwin Lupberger made several comments to En-tergy employees allegedly signifying his desire to hire a younger Entergy workforce. The plaintiffs contend that these statements constitute direct evidence of Entergy’s discrimination. The plaintiffs also contend that two statistical reports generated by Dr. W. Alen Watson, Enter-gy’s destruction of workplace documents, and “doctored” employee |42performance evaluations confirm Entergy’s direct evidence of discrimination.
 

 I. Did the Trial Court Properly Grant Summary Judgment As To The Six Remaining Plaintiffs?
 

 The plaintiffs contend that they have made prima facie
 
 McDonnell Douglas
 
 cases. In the alternative, the plaintiffs contend that Entergy’s proffered reasons for effectively terminating each of them was pretextual. For the following reasons, we find that Mr. Hickman has presented this Court with sufficient evidence of pretext to survive summary judgment. For the following reasons, we further find that the trial court properly granted summary judgment as to the remaining plaintiffs.
 

 1. Louis Frost
 

 Additional Facts
 

 The following additional facts as to Louis Frost were discerned from the hearings on Entergy’s motions for summary judgment.
 

 In late 1992, Louis Frost was employed in Louisiana Power and Light’s risk control and claims management department.
 
 [17]
 
 At that time, Mr. Frost was 47 years old.
 
 [18]
 
 In the early months of 1993, Entergy reorganized and centralized the risk control and claims management departments of its various operating companies. Prior to the reorganization, each of the operating companies had handled its own risk control and claims management. The reorganization of Louisiana Power and Light’s risk control and claims management department led to a system-wide reduction of employees in that department. Entergy supervisors selected employees from their various operating companies to staff the new department.
 

 
 *1191
 
 In early 1993, Mr. Frost’s supervisor William Carpenter told him that there 14Swas a chance that he would not be selected for the new department. Mr. Carpenter encouraged Mr. Frost to apply for other positions within Entergy. Mr. Frost applied to approximately ten positions within Entergy after his conversation with Mr. Carpenter. During his deposition, Mr. Frost testified that Mr. Carpenter recommended him for a position in the consolidated risk control and claims management department. However, Mr. Frost could not recall when Mr. Carpenter recommended him for the position. The applications Mr. Frost submitted did not result in his obtaining a different position with En-tergy.
 

 Entergy selected David Hunter to take command of the consolidated risk control and claims management division. In an affidavit, Mr. Hunter averred that he considered Mr. Frost for a position in the consolidated department. Mr. Hunter also considered Larry Maginnis, John Authe-mont, Jim Pilet, and Ronnie Willis for the same positions. All four men had previously been engaged in workers compensation and general liability claims management for Entergy under the supervision of Charlie Weill. Messrs. Maginnis, Authe-mont, Pilet, and Willis were all older than Mr. Frost. Ultimately, Mr. Frost was not selected to staff the centralized risk control and claims management department. Mr. Hunter selected Messrs. Maginnis, Authemont, Pilet, and Willis to handle Louisiana claims in the consolidated department rather than Mr. Frost. Mr. Frost’s last day of employment with Louisiana Power and Light was February 9, 1993. We note that Mr. Frost did not introduce any of his performance evaluations into the appellate record. Therefore, there is no documentation to support Mr. Frost’s contention that Entergy “doctored” his employee evaluations.
 

 By judgment dated October 14, 2008, the trial court granted Entergy’s motion for summary judgment and dismissed Mr. Frost’s claims with prejudice.
 

 Analysis
 

 |44Mr. Frost has proven that he was a member of the protected class and that he was terminated from his position. Thus, he has satisfied the first and third prongs of the
 
 McDonnell Douglas
 
 test. In an attempt to avoid the fourth prong of his prima facie case, Mr. Frost attempts to portray his termination as a “reduction in force.” We agree with Mr. Frost. Enter-gy consolidated Louisiana Power and Light’s risk control and claims management department with the risk control and claims management department of its other operating companies. Mr. Frost’s position was eliminated. Thus, Mr. Frost need not demonstrate that he was either replaced by someone outside the protected class, replaced by someone younger, or otherwise discharged because of his age.
 

 However, Mr. Frost must still prove the existence of evidence, either circumstantial or direct, from which a factfin-der might reasonably conclude that Enter-gy intended to discriminate in reaching its decision to terminate him. This he has not done. Mr. Lupberger’s allegedly discriminatory comments are not sufficient; Mr. Lupberger had no direct authority over whether or not to hire Mr. Frost to the consolidated department nor was the failure to offer Mr. Frost a position in the consolidated department due to Mr. Lup-berger’s comments. Dr. Watson’s reports are irrelevant because his analyses did not include employees similarly situated to Mr. Frost.
 

 We discern no evidence in the record that would lead a reasonable factfinder to conclude that Entergy intended to discriminate against Mr. Frost because of his age.
 
 *1192
 
 Conversely, the record indicates that En-tergy Consolidated the risk control and claims management departments of each of its operating companies system-wide. The record indicates that Mr. Frost’s functions were outsourced as a part of the reorganization and that four older employees were selected to handle Louisiana claims in the consolidated department. Mr. Frost has not met his burden of Improving that Entergy intended to discriminate in his termination.
 

 Accordingly, the trial court did not err in granting summary judgment in Enter-gy’s favor and dismissing Mr. Frost’s claims with prejudice.
 

 2. Charles K. Ohlmeyer, III
 
 Additional Facts
 

 The following additional facts as to Charles K. Ohlmeyer, III were discerned from the hearings on Entergy’s motions for summary judgment.
 

 In March of 1993, Charles K Ohlmeyer, III was employed as an Accountant III in Louisiana Power and Light’s tax department. Several of Mr. Ohlmeyer’s yearly performance reviews are contained in the record. In 1989, Mr. Ohlmeyer received a somewhat positive performance review from his supervisor Joel Durkes. Mr. Durkes noted that Mr. Ohlmeyer “exceeds most expectations” and that he was a “benefit to the Company.” However, Mr. Durkes also noted that Mr. Ohlmeyer needed to “trust all jobs as important” and listed other areas for growth. At some point in 1990, Kathryn Parham became Mr. Ohlmeyer’s supervisor. In her 1990 yearly review of Mr. Ohlmeyer’s performance, Ms. Parham noted that “[Mr. Ohl-meyer] consistently meets all mandated deadlines, doing whatever is necessary to get the job done.” Ms. Parham also noted areas in which Mr. Ohlmeyer needed improvement, such as accounting for income taxes and objectivity in research. At some point in 1991, Terrell Martin became Mr. Ohlmeyer’s supervisor. Two of Mr. Ohl-meyer’s 1991 yearly performance reviews are contained in the record. In his 1991 Louisiana Power and Light performance review, Mr. Ohlmeyer’s supervisor was somewhat critical.
 
 [19]
 
 In his 1991 Entergy performance review, Mr. Martin was very critical of Mr. Ohlmeyer’s performance. For example, Mr. Martin 14finoted that Mr. Ohlmeyer left several projects unresolved, which required Mr. Martin’s intervention. Mr. Martin also noted that Mr. Ohlmeyer had not developed his understanding of accounting for income taxes. In his 1991 Entergy performance review, Mr. Ohlmeyer was rated “does not meet expectations.”
 

 On March 13, 1992, Mr. Ohlmeyer was placed on a Performance Improvement Plan by his supervisors. The goal of the plan was to increase Mr. Ohlmeyer’s tax accounting knowledge and analytical abilities. Under the terms of the Plan, Mr. Ohlmeyer was required to meet with his supervisors once per month at predetermined status review dates. He was further required to complete all of his work without errors, to attend additional tax-related training, and to improve his diplomacy in written and oral communications. Mr. Ohlmeyer was removed from the Plan on September 2, 1992, though his supervisors noted that there were still numerous areas for improvement.
 

 In the early months of 1993, Entergy merged its tax department with the tax department of Louisiana Power and Light and the tax departments of its other operating companies. Entergy selected Nathan Langston of Arkansas Power and
 
 *1193
 
 Light to head the consolidated tax department. Mr. Langston was responsible for selecting tax professionals from Entergy’s operating companies to staff the consolidated department. In his deposition, Mr. Langston testified that the consolidated department initially had positions for approximately twenty tax professionals. Mr. Langston selected only three professionals from Entergy operating companies to staff the consolidated department. The three professionals Mr. Langston selected from Entergy operating companies were Mr. Martin, Caruso Netter, and Rory Roberts. Caruso Netter was also an Accountant III at Louisiana Power and Light working under Mr. Martin. Mr. Roberts was hired from Arkansas Power and Light. The remaining positions in the department were filled with | ^professionals who were already members of Entergy’s tax department before the consolidation.
 

 According to Mr. Langston, he did not know Mr. Ohlmeyer when he began the selection process for the new department, though he was familiar with Mr. Martin. Mr. Langston stated that he did not hire Mr. Ohlmeyer because Mr. Ohlmeyer did not have the requisite qualification to join the new department. Thus, Mr. Ohlmeyer was discharged in March of 1993. At the time, Mr. Ohlmeyer was 41 years old and Caruso Netter was 38 years old. Mr. Langston was not sure how old Mr. Roberts was, but he had worked with Mr. Roberts at Arkansas Power and Light and knew that Mr. Roberts was “much younger” than Mr. Ohlmeyer.
 

 By judgment dated September 24, 2008, the trial court granted Entergy’s motion for summary judgment and dismissed Mr. Ohlmeyer’s claims with prejudice.
 

 Analysis
 

 The parties do not dispute that Mr. Ohlmeyer was discharged or that he was a member of the protected class. Thus, Mr. Ohlmeyer has met the first and third prongs of his
 
 McDonnell Douglas
 
 prima facie case. Entergy contends that Mr. Ohlmeyer was not “qualified for his position” under the second prong of the
 
 McDonnell Douglas
 
 test. In
 
 Bienkowski v. American Airlines, Inc.,
 
 851 F.2d 1503 (5th Cir.1988), an employer alleged that the plaintiff was not qualified for his job as a security representative, even though his performance had been satisfactory for ten years, “because his supervisors became unsatisfied with his work.”
 
 Id.
 
 at 1504-05. The employer submitted two affidavits from the plaintiffs supervisors documenting a decline in his performance.
 
 Id.
 
 at 1505. The employer argued that under the
 
 McDonnell Douglas
 
 test, the plaintiff must prove that he performed his job to the standards of his employer.
 
 Id.
 
 Thus, the employer argued, the plaintiff | ^failed to establish a prima facie case.
 
 Id.
 
 In rejecting this argument, the U.S. Fifth Circuit reasoned that:
 

 [A] plaintiff challenging his termination or demotion ... can ordinarily establish a prima facie case of age discrimination by showing that he continued to possess the necessary qualifications for his job at the time of the adverse action
 

 * * *
 

 By this we mean that plaintiff had'not suffered physical disability or loss of a necessary professional license or some other occurrence that rendered him unfit for the position for which he was hired.
 

 Id.
 
 at 1506;
 
 Id.
 
 at n. 3.
 

 The court established this rule in order to simplify application of the
 
 McDonnell Douglas
 
 paradigm in the context of termination and demotion'cases. The court concluded in applying this reasoning, “[t]he lines of battle may then be drawn over the
 
 *1194
 
 employer’s articulated reason for its action and whether that reason is a pretext for age discrimination.”
 
 Id.
 
 at 1506.
 

 In its brief to this Court, Entergy suggests that
 
 Bienkowski
 
 has been supplanted by
 
 Sreeram v. Louisiana State University Medical Center-Shreveport,
 
 188 F.3d 314 (5th Cir.1999).
 
 [20]
 
 We disagree. In
 
 Sreeram,
 
 the court held that the plaintiff was not qualified because she had received numerous and unanimous negative performance reviews from the moment that she began working as a medical resident. The court noted “[e]very doctor to evaluate [the plaintiff] found that her performance as a surgeon was insufficient to allow her to continue in the program. No evidence of bias was alleged regarding most of these doctors, leaving a chorus of negative evaluations unrebutted by a single positive testimonial.”
 
 Id.
 
 at 318. That is not the case here. While Mr. Ohlmeyer’s performance evaluations were largely negative, he did earn some praise from his supervisors. In addition, |49we note that the U.S. Fifth Circuit has reaffirmed the viability of the
 
 Bienkowski
 
 rule since
 
 Sreeram. See, e.g., Berquist v. Washington Mut. Bank,
 
 500 F.3d 344, 351 (5th Cir.2007),
 
 cert. denied,
 
 552 U.S. 1166, 128 S.Ct. 1124, 169 L.Ed.2d 950 (2008) (“[similar to the plaintiff in
 
 Bienkowski,
 
 however, [the plaintiff] possessed the same job qualifications when [the employer] terminated him as when [his supervisor] assigned him to the credit review position. Accordingly, [the plaintiff] need not show that his performance met [the employer’s] expectations to establish a prima facie case.”).
 

 In this case, Mr. Ohlmeyer possessed the same job qualifications when Entergy terminated him as when he became an Accountant III. Although Entergy submitted evidence that Mr. Ohlmeyer’s supervisors were not pleased with his performance, this evidence does not prove a lack of qualifications at the prima facie stage.
 
 See by analogy Medina v. Ramsey Steel Co., Inc.,
 
 238 F.3d 674, 681 (5th Cir.2001) (holding on summary judgment that an employer may not utilize wholly subjective standards by which to judge its employees’ qualifications and then plead lack of qualification when its promotion process is challenged as discriminatory);
 
 Lindsey v. Prive Corp.,
 
 987 F.2d 324, 327 (5th Cir. 1993) (holding that it is not appropriate for the district court to determine whether subjective criteria are bona fide, in effect making dispositive determinations about the employer’s credibility, on summary judgment). Thus, we find that Mr. Ohl-meyer was “qualified for the position” and, therefore, that he has satisfied the second prong of the prima facie case.
 

 Entergy also disputes whether Mr. Ohlmeyer has met the fourth prong of his prima facie case. In its brief to this Court, Entergy contends that the age difference between Mr. Ohlmeyer and Caruso Netter was not significant enough to constitute | .^probative evidence of age discrimination.
 
 [21]
 

 The Louisiana Supreme Court has held that an ADEA plaintiff satisfies this prong of the
 
 McDonnell Douglas
 
 prima facie case when he or she shows that an employee outside the protected class was “treated more favorably.”
 
 LaBove v. Raftery,
 
 2000-1394 (La.11/28/01) 802 So.2d 566, 573.
 
 *1195
 
 The U.S. Fifth Circuit has similarly determined that an ADEA plaintiff can meet this prong of a
 
 McDonnell Douglas
 
 prima facie case by proving that he or she was replaced by “someone outside the protected class.”
 
 Machinchick,
 
 398 F.3d at 350.
 
 [22]
 

 In this case, Mr. Olhmeyer has proven that he was terminated at the age of forty-one and that he was replaced by Caruso Netter, who was thirty-eight years old at the time of Mr. Ohlmeyer’s termination. Mr. Ohlmeyer has therefore proven that an individual outside the protected class was treated more favorably than himself. Thus, we find that Mr. Ohlmeyer has established the fourth prong of the
 
 McDonnell Douglas
 
 prima facie case.
 

 The question then becomes has Entergy presented a legitimate non-discriminatory reason for not offering Mr. Ohlmeyer a position. We find that it has. Mr. Ohlmeyer’s department and position were eliminated during Entergy’s restructuring. Mr. Ohlmeyer was considered for a position in the consolidated department; however, Mr. Langston chose not to offer him a position. During his deposition, Mr. Langston testified that Mr. Ohlmeyer did not have the type of “tax Inexperience” that he was looking for in the consolidated department. This is corroborated by Mr. Ohlmeyer’s 1991 performance evaluation which indicated that he needed to increase his understanding of accounting for income taxes. Mr. Langston’s testimony is also corroborated by Mr. Ohlmeyer’s placement on the Performance Review Plan in 1992 to improve his familiarity with tax law.
 

 Mr. Ohlmeyer has presented no evidence to contradict Entergy’s legitimate, non-discriminatory reason for deciding not offer him a position in the consolidated tax department. In their brief, the plaintiffs allege that Entergy managers fabricated reasons for terminating older employees to further Mr. Lupberger’s vision of a “younger” company. However, it is clear from the record that Mr. Ohlmeyer received several negative performance evaluations before Mr. Lupberger made his allegedly discriminatory comments to the
 
 Times-Picayune
 
 and Entergy employees. Moreover, Entergy’s explanation for not offering Mr. Ohlmeyer a position in the consolidated tax department is “not unworthy of credence;” the new department had different responsibilities for which Mr. Ohlmeyer was not suited.
 

 Based on the foregoing, we conclude that Entergy presented a legitimate nondiscriminatory reason for not offering Mr. Ohlmeyer a position and that Mr. Ohlmeyer has not demonstrated that the reason
 
 *1196
 
 for the adverse employment decision was pretextual. Accordingly, we affirm the trial court’s judgment granting Entergy summary judgment as to Mr. Ohlmeyer’s claims.
 

 3. Linda Porrovecchio
 

 Additional Facts
 

 The following additional facts as to Linda Porrovecchio were discerned from the hearings on Entergy’s motions for summary judgment.
 

 In 1991, Linda Porrovecchio was employed as a secretary at Louisiana |fi2Power and Light. In the early months of 1991, Ms. Porrovecchio was reassigned to the newly formed Distribution Area Design department under the supervision of Mark Bruckner. Mr. Bruckner supervised four clerks and four salaried engineers in the new department. Ms. Porrovecchio was a clerk in the new department. The other three clerks were Joan Landry, Kevin Massey, and Liz Green. At the time of the formation of the Distribution Area Design department, Ms. Landry was 48 and Ms. Green was 46.
 
 [23]
 
 Before she was reassigned to the Distribution Area Design department, Ms. Porrovecchio’s duties largely consisted of traditional secretarial work. However, after her reassignment, Ms. Porrovecchio was required to perform a more varied array of tasks, including data entry.
 

 In a deposition, Mr. Bruckner testified that Ms. Porrovecchio was unhappy about her 1991 reassignment. According to Mr. Bruckner, Ms. Porrovecchio was reluctant to work with the other clerks and often voiced her displeasure with data entry to other department employees. Mr. Bruckner testified that the goal of the consolidation was to foster a team approach and to allow engineers to take on more complex projects. According to Mr. Bruckner, Ms. Porrovecchio did not adapt well to the change.
 

 Ms. Porrovecchio’s 1990 annual performance review is contained in the record. Generally, the review was quite positive. The review noted that Ms. Porrovecchio “consistently [met] expectations” in various areas. However, the review also noted that Ms. Porrovecchio had “trouble sometimes with the priority of the work given to her.” Ms. Porrovecchio’s 1991 annual performance review is also contained in the record. The review lists both praise and criticism. For example, the review noted that Ms. Porrovecchio was very personable face to face and that she worked hard to prioritize her work. However, the review also noted |ssthat Ms. Porrovecchio would sometimes leave phones unanswered due to arriving late or leaving early, that she needed to communicate regularly to balance work loads, and that she needed to improve upon noting a caller’s reason for contacting the Distribution Area Design department. The report concluded, “Linda’s responsibilities changed several times in 1991. She is working hard to keep up and provide a pleasant work experience.”
 

 In late 1992, Mr. Bruckner was instructed by his supervisor to terminate several of the employees in his department. After reviewing the qualifications of all of his employees, Mr. Bruckner decided to terminate Ms. Porrovecchio in February 1993. Ms. Porrovecchio’s termination is evidenced by a memorandum in the record. In the memorandum, Mr. Bruckner’s supervisor A1 Grille noted that Ms. Porrovec-chio’s “production has always been marginally acceptable and has not improved.”
 
 *1197
 
 The memorandum contrasted Ms. Porro-vecchio’s performance with that of Liz Green, noting that Ms. Green’s disposition and performance had significantly improved during her time with the Distribution Area Design department. Mr. Bruckner decided to retain Joan Landry, Kevin Massey, and Liz Green. After her termination, Jackie McCloskey replaced Ms. Porrovecchio. Jackie McCloskey was fifty-six years old and Ms. Porrovecchio was forty-one years old at the time.
 

 During her deposition, Ms. Porrovecchio did not dispute any of Mr. Bruckner’s testimony. She noted that two other employees she knew in different divisions were terminated and expressed her belief that she was terminated due to her age.
 

 By judgment dated July 1, 2008, the trial court granted Entergy’s motion for summary judgment and dismissed Ms. Porrovecchio’s claims with prejudice.
 

 Analysis
 

 l.^Ms. Porrovecchio has proven that she was a member of the protected class and that she was discharged. However, an older employee replaced Ms. Por-rovecchio. Thus, Ms. Porrovecchio cannot satisfy the fourth prong of her prima facie
 
 McDonnell Douglas
 
 case.
 

 In an attempt to avoid the fourth prong of her prima facie case, Ms. Porro-vecchio attempts to portray her termination as a “reduction in force.” Ms. Por-rovecchio is correct in her assertion that when a company reduces its workforce and the reduction results in an adverse impact on older employees, a plaintiff does not necessarily have to show that a younger employee replaced him.
 
 See, e.g., Walther v. Lone Star Gas Company,
 
 952 F.2d 119, 123 (5th Cir.1992) (“we note that the fact that Walther was replaced by an older employee rather than a younger one does not necessarily show that he was not discriminated against because of his age. This is a reduction in force case.”). In a reduction in force case, a prima facie case is established by evidence that (1) that he is within the protected age group; (2) that he has been adversely affected by the employer’s decision; (3) that he was qualified to assume another position at the time of the discharge; and (4) evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.
 
 Nichols v. Loral Vought Sys. Corp.,
 
 81 F.3d 38, 41 (5th Cir.1996).
 

 Ms. Porrovecchio has failed to demonstrate that her termination was due to a reduction in force. The fact that Entergy was reducing its workforce at the same time Ms. Porrovecchio was terminated is immaterial to the issue of the reason for Ms. Porrovecchio’s termination. In
 
 Barnes v. GenCorp, Inc.,
 
 896 F.2d 1457, 1465 (6th Cir.1990),
 
 cert. denied,
 
 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990), the United States Sixth Circuit provided guidance for distinguishing situations where an employee has been “replaced” from those in which the employee’s position has been eliminated as | fi5part of a true reduction in force:
 

 A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiffs duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee
 
 *1198
 
 is hired or reassigned to perform the plaintiffs duties.
 

 896 F.2d at 1465 (emphasis added).
 

 See also Cates v. Regents of New Mexico Institute of Min. & Technology,
 
 124 N.M. 633, 954 P.2d 65, 71 (1998) (“a reduction in force necessitates that positions are eliminated”)- Here, the parties do not dispute that Jackie McCloskey replaced Ms. Por-rovecchio. It is similarly undisputed that Ms. McCloskey took over Ms. Porrovec-chio’s duties and that Ms. Porrovecchio’s former position was not eliminated. Ms. Porrovecchio’s case is not a reduction case. It is a replacement case. Ms. Porrovec-chio is not entitled to use the relaxed evidentiary burden utilized in reduction in force cases.
 

 Ms. Porrovecchio cannot satisfy the fourth prong of the
 
 McDonnell Douglas
 
 test. Accordingly, she has not met her initial burden of making a prima facie
 
 McDonnell Douglas
 
 case. The trial court did not err in granting summary judgment in Entergy’s favor.
 

 4. Marion Boudreaux
 

 Additional Facts
 

 The following additional facts as to Marion Boudreaux were discerned from the hearings on Entergy’s motions for summary judgment.
 

 In 1993, Marion Boudreaux was employed as a manager in Louisiana Power and Light’s Customer Service Telephone Center. Ms. Boudreaux turned 40 on [BfiJanuary 4, 1993. At the time of her discharge, Ms. Boudreaux’s supervisor was Charlotte C. Roussel and there were nine supervisors in the telephone center. Ms. Boudreaux was the youngest of the nine supervisors in the telephone center.
 

 Several of Ms. Boudreaux’s periodic employee evaluations are contained in the record. Ms. Boudreaux’s evaluations were generally mixed. For example, in Ms. Boudreaux’s 1990 employee report, Ms. Roussel noted that Ms. Boudreaux “monitored each employee monthly and turned in complete reports” and that Ms. Boudreaux “helped in making our new CSTC a success by giving input to improve our operation.” In Ms. Boudreaux’s 1991 annual performance report, Ms. Roussel noted that Ms. Boudreaux “worked many extended hours to insure maximum performance.” However, Ms. Roussel also noted that Ms. Boudreaux needed “to work harder” at meeting certain requirements.
 

 In late 1992, Ms. Roussel’s supervisors informed her that she would have to demote several managers in her department. During her deposition, Ms. Roussel testified that Ms. Boudreaux met Entergy’s requirements in some areas, but not in other areas. According to Ms. Roussel, she had to work with Ms. Boudreaux more than she did with other supervisors. Ms. Roussel additionally testified that other managers in the department had more leadership ability and initiative and that Ms. Boudreaux’s productivity had been a problem.
 

 On January 7, 1993, Ms. Roussel informed Ms. Boudreaux that she was being demoted. Ms. Boudreaux had turned 40 three days earlier. Rather than accepting the demotion, Ms. Boudreaux chose to voluntarily retire from Entergy. Her last day of employment with Entergy was February 10, 1993. Ms. Boudreaux was replaced by Barbara Hebert. At the time of Ms. Boudreaux’s demotion, Ms. Hebert was 42 years old. Eventually, three managers were demoted and three phone representatives were promoted to take their place. No jobs were eliminated |fi7in the Customer Service Telephone Center.
 

 By judgment dated October 14, 2008, the trial court granted Entergy’s motion
 
 *1199
 
 for summary judgment and dismissed Ms. Boudreaux’s claims with prejudice.
 

 Analysis
 

 It is undisputed that Ms. Bou-dreaux was a member of the protected class and that she was demoted.
 
 [24]
 
 Thus, she has met the first and third prongs of the
 
 McDonnell Douglas
 
 test. However, after refusing her demotion and retiring, an older employee replaced Ms: Bou-dreaux. Accordingly, Ms. Boudreaux has not met the fourth prong of the
 
 McDonnell Douglas
 
 test. In an attempt to avoid the fourth prong of her prima facie case, Ms. Boudreaux attempts to portray her termination as a reduction in force.
 

 For the reasons described in the above analysis of Ms. Porrovecchio’s claims, we find that Ms. Boudreaux was not terminated due to a reduction in force. Ms. Bou-dreaux voluntarily retired rather than accepting a demotion. The parties do not dispute that Ms. Roussel decided to demote three managers (including Ms. Bou-dreaux) and to promote three customer care representatives to managerial positions. No positions were eliminated. Moreover, the parties do not dispute that Barbara Hebert took over Ms. Bou-dreaux’s duties. Ms. Boudreaux is not entitled to use the relaxed evidentiary burden utilized in reduction in force cases.
 

 Ms. Boudreaux cannot satisfy the fourth prong of the
 
 McDonnell Douglas
 
 test. Accordingly, she has not met her initial burden of making a prima facie
 
 McDonnell Douglas
 
 case. The trial court did not err in granting summary judgment in Enter-gy’s favor and dismissing Ms. Boudreaux’s claims with | ¡¡¡¡prejudice.
 

 5. Terry Canzoneri
 

 Additional Facts
 

 The following additional facts as to Terry Canzoneri were discerned from the hearings on Entergy’s motions for summary judgment.
 

 In 1993, Terry Canzoneri was employed as a senior accounting clerk in the property accounting department of New Orleans Public Service, Inc. At the time he was terminated, Mr. Canzoneri was forty-nine years old. His supervisor was Phillip Gil-lam. While Mr. Canzoneri was employed by New Orleans Public Service, his tasks consisted largely of manually driven processes such as entering data into New Orleans Public Service’s ledger sheets. Mr. Canzoneri also handled expense accounts.
 

 In the early 1990s, New Orleans Public Service’s property accounting department began transitioning from manually driven processes to computer-based processes. In addition, Entergy consolidated the property accounting departments of New Orleans Public Service, Inc., Louisiana Power and Light, Mississippi Power and Light, and Arkansas Power and Light into a single department. The consolidated department was to be located in Little Rock, Arkansas. During his deposition, Mr. Canzoneri’s former supervisor Phillip Gillam testified that the skills required of employees in the consolidated property accounting department were the ability to meet required monthly closing deadlines and proficiency in handling new technologies. Mr. Gillam testified that Mr. Canzoneri did not adapt to the new technologies that the consolidated proper
 
 *1200
 
 ty accounting department was using. Mr. Gillam also testified that Mr. Can-zoneri was not particularly organized and sometimes had trouble meeting deadlines.
 

 |B9Mr. Canzoneri’s annual employee review from 1991 is contained in the record. Generally, Mr. Canzoneri met his supervisor’s expectations. His supervisor noted that Mr. Canzoneri completed tasks on schedule and that he “maintained good customer relations with field personnel.” At some point in 1992, Mr. Canzoneri and several of his fellow clerks had a meeting with upper level New Orleans Public Service managers. The clerks were informed that their positions would not be terminated for at least one year. However, Mr. Gillam’s supervisors informed him shortly thereafter that he would have to terminate several of his employees. On January 8, 1993, Mr. Gillam informed Mr. Canzoneri that his position was being terminated. According to Mr. Canzoneri, approximately ten additional clerks were informed that their positions were being terminated that day.
 

 Entergy’s general accounting department remained in New Orleans. Three accounting clerks who had been employed by New Orleans Public Service were offered positions in Entergy’s general accounting department. The three clerks offered positions in the consolidated department were Maggie Lumette, Gay Gomez, and Wendy Chavez. In 1993, Ms. lumette was 54 years old, Ms. Gomez was 33 years old, and Ms. Chavez was 31 years old. Mr. Canzoneri was not offered a position in Entergy’s accounting department.
 

 By judgment dated September 24, 2008, the trial court granted Entergy’s motion for summary judgment and dismissed Mr. Canzoneri’s claims with prejudice.
 

 Analysis
 

 It is undisputed that Mr. Canzoneri was discharged and that he was a member of the protected class. Thus, Mr. Canzoneri has satisfied the first and third prongs of the
 
 McDonnell Douglas
 
 test. Entergy does not dispute that Mr. Canzoneri was qualified for his job. In addition, Mr. Can-zoneri has proven that hej^was considered for a position in Entergy’s accounting department but that two younger employees were considered for similar positions. Thus, Mr. Canzoneri has successfully made a prima facie
 
 McDonnell Douglas
 
 case. In addition, we believe that Mr. Canzoneri has demonstrated that his termination was due to a reduction in force. Mr. Canzon-eri’s entire division was essentially moved to Little Rock, Arkansas. Mr. Canzoneri was not replaced in New Orleans; his position was eliminated.
 

 However, Entergy has presented a legitimate non-discriminatory reason for not offering Mr. Canzoneri a position in the consolidated department. According to his supervisor, Mr. Canzoneri did not adapt to the new technologies that the consolidated accounting department was using. In order to be eligible for employment in the consolidated department, employees were required to be proficient in the new technologies. Mr. Canzoneri’s supervisor also testified that Mr. Canzoneri was not particularly organized and sometimes had trouble meeting deadlines.
 

 The burden now shifts to Mr. Canzoneri to prove by a preponderance of the evidence that Entergy’s proffered reason for his termination was a mere pretext for age discrimination. We find that he cannot do so. Mr. Canzoneri’s supervisor informed him that he was being displaced because the department was consolidating and moving to Arkansas. Many employees in the New Orleans department lost their jobs. Employees ranging from their twenties to their sixties were outplaced, a fact which was freely admitted by Mr.
 
 *1201
 
 Canzoneri. At least one older employee was offered a position in the consolidated Arkansas department. Quite simply, Mr. Canzoneri has failed to rebut Entergy’s legitimate, nondiscriminatory reason with evidence that his termination was related to his age. Demonstrating a “pretext” without providing evidence that his termination was lfl1 related to his age does not allow Mr. Canzoneri to clear the hurdles necessary to rebut Entergy’s legitimate, nondiscriminatory reason.
 
 See, e.g., Martin v. Waring Investments Inc.,
 
 323 Fed.Appx. 313, 317 (5th Cir.2009) (unreported) (citing
 
 Rachid,
 
 376 F.3d at 312).
 

 We find that Entergy has proffered a legitimate reason for Mr. Canzoneri’s termination. Mr. Canzoneri has not proven that his firing was pretextual. Accordingly, the trial court did not err in granting summary judgment in Entergy’s favor and dismissing Mr. Canzoneri’s claims with prejudice.
 

 6. Willie Hickman
 

 Additional Facts
 

 The following additional facts as to Willie Hickman were discerned from the hearings on Entergy’s motions for summary judgment.
 

 In late 1993, Willie Hickman was employed by Entergy as an Accountant III. At that time, Entergy acquired Gulf States Utilities Company. Entergy thereafter began consolidating and reorganizing the accounting departments of its various operating companies into a single centralized accounting department. Harry Forbes was chosen by Entergy to lead and staff the centralized accounting department. Gulf States Utilities had employed Mr. Forbes as a manager prior to its acquisition by Entergy. In his deposition, Mr. Forbes stated that his policy at Gulf States Utilities had been to reassign employees who had been in the same position or doing the same work for a long period of time. According to Mr. Forbes, the purpose of this policy was “to expand [the] knowledge” of the employees who had been doing the same work for a long period of time. Entergy decided to adopt Mr. Forbes’s policy.
 

 After Entergy reorganized its accounting department, Mr. Forbes supervised | ^eleven employees. Seven employees were degreed accountants. Four of these seven employees, including Mr. Hickman, had no experience in “external reporting.” Mr. Hickman had a college degree in business but was not a certified public accountant.
 

 Mr. Forbes was quite critical of Mr. Hickman’s performance. For example, in a memorandum, Mr. Forbes noted that Mr. Hickman “want[ed] to answer the questions, and attempts to, but his extremely poor analytical skills keep him from doing the necessary work.” In an interim review, Mr. Forbes acknowledged that Mr. Hickman was a hard and dedicated worker but noted that Mr. Hickman had to “focus and improve his understanding of the entire process.” At least one of Mr. Hickman’s fellow employees expressed similar observations regarding Mr. Hickman’s lack of analytical and technical skills.
 

 Mr. Forbes’s assessment of Mr. Hickman’s performance is in marked contrast with Mr. Hickman’s previous employee evaluations. Several of Mr. Hickman’s annual performance reviews are contained in the record. Mr. Hickman’s evaluations were generally extremely positive. For example, in 1990, Mr. Hickman’s supervisor noted that Mr. Hickman’s willingness to put in long hours resulted in “the professional appearance of [a] report.” Further, his supervisor noted that Mr. Hickman “require[d] little supervision and is an extremely productive employee.” An evalúa
 
 *1202
 
 tion from 1984 indicated that Mr. Hickman “show[s] above average knowledge of all phases of his job and requires little supervision.” Mr. Hickman’s supervisor additionally noted that Mr. Hickman was “a very good team member.”
 

 According to Mr. Forbes, Mr. Hickman’s tasks at Entergy prior to the reorganization had largely consisted of preparing reports for the Federal Energy Regulatory Commission and handling bank reconciliations. However, under Mr. | ^Forbes's supervision, Mr. Hickman was required to take on a more diverse array of tasks. In Mr. Forbes’s opinion, Mr. Hickman should have been capable of external reporting because he had a college degree. During his deposition, Mr. Forbes indicated that Mr. Hickman’s work was often late and contained many errors. Mr. Forbes also indicated that Mr. Hickman insisted on doing his work by hand, which was inefficient.
 

 In July 1994, Mr. Forbes placed Mr. Hickman on an “action plan” to improve his performance. Mr. Forbes informed Mr. Hickman that if he did not improve his performance over a six-week period, he would be placed on another six-week action plan. If Mr. Hickman did not improve his performance over the second six-week period, he would be terminated. Under the terms of the action plan, Mr. Hickman and Mr. Forbes met once a week to discuss Mr. Hickman’s performance. During the action plan, Mr. Forbes reported several deficiencies in Mr. Hickman’s performance and often noted that Mr. Hickman “did not grasp his current projects with the understanding of a 25 year employee.”
 
 [25]
 

 In Mr. Forbes’s opinion, Mr. Hickman’s performance did not improve over a twelve-week period. Therefore, in November 1994, Mr. Forbes terminated Mr. Hickman from his position as an Accountant III. Mr. Forbes hired Lori Samaha, a new accountant, to replace Mr. Hickman. At the time, Ms. Samaha was “approximately” 30 years old.
 

 By judgment dated September 24, 2008, the trial court granted Entergy’s motion for summary judgment and dismissed Mr. Hickman’s claims with prejudice.
 

 Analysis
 

 Mr. Hickman has proven the first and third prongs of the
 
 McDonnell Douglas
 
 test. Entergy contends that Mr. Hickman was not qualified for his position. We disagree. For the reasons described above, the
 
 Bienlcowski
 
 test applies here. Mr. Hickman possessed the same job qualifications when Entergy terminated him as when he became an Accountant III. Entergy submitted evidence that Mr. Forbes was not pleased with Mr. Hickman’s performance; however, this evidence does not prove a lack of qualifications at the prima facie stage.
 
 See Medina,
 
 238 F.3d at 681. Thus, we find that Mr. Hickman was “qualified for the position” and that he has satisfied the second prong of the
 
 McDonnell Douglas
 
 prima facie case. We additionally find that Mr. Hickman has satisfied the fourth prong of the prima facie case; Mr. Forbes testified that Mr. Hickman was replaced by an accountant who was “about thirty.”
 

 Entergy has proffered a legitimate non-diseriminatory reason for Mr. Hickman’s termination; namely, that his performance was unsatisfactory. There is ample proof in the record that Mr. Forbes was displeased with Mr. Hickman’s job performance. Mr. Forbes was adamant that Mr.
 
 *1203
 
 Hickman was not capable of performing his designated tasks.
 

 However, we conclude that Mr. Hickman has presented sufficient evidence to create a genuine issue of material fact concerning his claim that Entergy’s proffered reasons for his termination were pretextual.
 

 Mr. Hickman had a singularly unblemished employee evaluation record. Approximately ten years worth of Mr. Hickman’s evaluations are contained in the record, and they are essentially unanimous in their praise of Mr. Hickman. Entergy does not dispute that Mr. Hickman had an excellent evaluation record prior to his reassignment to Mr. Forbes. According to Mr. Forbes, Mr. Hickman did not have the training necessary to complete his assignments. Mr. Hickman candidly admitted that without training in new duties to which he had never ] ^previously been assigned, he was not able to perform those duties. The parties do not dispute that when Mr. Forbes became Mr. Hickman’s supervisor, Mr. Hickman’s responsibilities changed.
 

 Mr. Hickman argues that Entergy transferred him to new duties without retraining him for the purpose of compelling poor reviews from his supervisors and terminating his employment. We agree that Entergy’s actions allow a reasonable inference that Entergy attempted to conceal a discriminatory reason for terminating Mr. Hickman. Accordingly, we find that Mr. Hickman has raised a material issue of fact as to whether Entergy’s actions in changing his duties without retraining him were a pretext for age discrimination. The portion of the September 24, 2008 judgment dismissing Mr. Hickman’s claims is reversed. We further render judgment denying Entergy’s motion for summary judgment as to Mr. Hickman.
 

 IV. CONCLUSION AND DECREE
 

 For the foregoing reasons, the portion of the September 24, 2008 judgment dismissing Willie Hickman’s claims is reversed and judgment is rendered denying Enter-gy’s motion for summary judgment as to Mr. Hickman. In all other respects, the June 16, 2008 judgment, the July 1, 2008 judgment, the September 24, 2008 judgment, and the October 14, 2008 judgment are affirmed. This matter is remanded to the trial court for further proceedings consistent witty this opinion.
 

 JUDGMENTS AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REMANDED.
 

 [1]
 

 . These defendants/appellees will be collectively referred to as "Entergy.”
 

 [2]
 

 . The eight individual defendants named in the Petition were Richard A. Cuicchi, Albert C. King, Ramon Baulmay, William O. Van As, William Brewer, George Bartlett, Ronnie Beam, and Charles Kelly. Mr. Van As is alternatively referred to as Mr. “Van As” and Mr. “VanAs" in the appellate record. For the sake of consistency, we will refer to him as “Mr. Van As.”
 

 [3]
 

 .
 
 Ricks
 
 is a national origin discrimination case, not an age discrimination case. However, federal courts have concluded that the Supreme Court's analysis of the time limitations question applies to age discrimination cases as well.
 
 See, e.g., Clark v. Resistoflex Co.,
 
 854 F.2d 762, 765 (5th Cir.1988). Therefore, the
 
 Ricks/Chardon
 
 rule is applicable here.
 

 [4]
 

 . Delaware State College is now known as Delaware State University.
 

 [5]
 

 . A "right to sue letter” is a letter issued by the EEOC indicating that it has found no probable cause of discrimination.
 

 [6]
 

 . Louisiana state courts often look to federal jurisprudence in interpreting state discrimination laws such as the LCHRA.
 
 See, e.g., Lee v. Constar, Inc.,
 
 05-633 (La.App. 5 Cir. 2/14/06), 921 So.2d 1240, 1246,
 
 writ denied,
 
 06-880 (La.6/2/06) 929 So.2d 1263.
 

 [7]
 

 . The terms of the TAP are not contained in the record before us.
 

 [8]
 

 . La. C.C.P. art. 596 provides that "[l]ibera-tive prescription on the claims arising out of the transactions or occurrences described in a petition brought on behalf of a class is suspended on the filing of the petition as to all members of the class as defined or described therein.” La. C.C.P. art. 596 was enacted by Acts 1997, No. 839 § 1, and did not become effective until July 1, 1997. Moreover, Acts 1997, No. 839 § 13 provides that ”[t]he provisions of this Act shall be applicable only to actions filed on and after its effective date.” Thus, La. C.C.P. art. 596 was not in effect at the time of Mr. Ruiz's termination and is not applicable here.
 

 [9]
 

 . The plaintiffs' second supplemental and amending petition defined the class as "employees between the ages of forty and seventy, who have been terminated from employment with Entergy.”
 

 [10]
 

 . Typically, statistical reports are used in disparate impact cases to prove that a facially
 
 *1184
 
 neutral employment policy had a disproportionate negative impact on a protected class of employees. In this case, the plaintiffs appear to rely upon Dr. Watson's statistical reports to prove direct evidence of discrimination in their disparate treatment claims as well as evidence to support their disparate impact claims. For example, each plaintiff's brief contends that the “facts presented give rise to a claim for disparate treatment under the U.S. Supreme Court’s holding in
 
 Meacham [v. Knolls Atomic Power Laboratory,
 
 554 U.S. 84, 128 S.Ct. 2395, 171 L.Ed.2d 283 (2008) ]”. However, the brief further states that "plaintiffs have asserted claims under a disparate impact theory of liability.” (emphasis added). Moreover, as explained below,
 
 Meacham
 
 is a disparate impact case, not a disparate treatment case. We find that Dr. Watson’s reports are not relevant to the plaintiffs' disparate impact or disparate treatment claims because the reports analyzed individuals not comparable to the instant plaintiffs.
 

 [11]
 

 . Although
 
 Bodenheimer
 
 did not explicitly state the three-step procedure applies
 
 to
 
 cases based on "circumstantial evidence,” the procedure only applies to those cases where an ADEA plaintiff cannot present direct evidence of discrimination.
 

 [12]
 

 . Title VII of the Civil Rights Act of 1964 prohibits discrimination by covered employers on the basis of race, color, religion, sex or national origin.
 
 See
 
 42 U.S.C. § 2000
 
 et seq.
 

 [13]
 

 .
 
 Rachid
 
 is an ADEA case; however, in
 
 Ra-chid,
 
 the court utilized the
 
 Price Waterhouse
 
 framework for mixed motive cases in its analysis, which no longer applies to ADEA cases post-Gross. That has no bearing on the federal Fifth Circuit’s pretext analysis.
 

 [14]
 

 . 29 U.S.C. § 623(f)(1) provides that it is not unlawful to discriminate on the basis of age “where the differentiation is based on reasonable factors other than age.”
 

 [15]
 

 . The
 
 Wards Cove
 
 Court held a plaintiff could establish a prima facie case in a Title VII disparate impact claim by: 1) identifying the specific employment practices being challenged; 2) establishing disparate impact on a protected group; and 3) demonstrating that the disparity was the causal result of one or more of the employment practices identified.
 
 Wards Cove,
 
 490 U.S. at 656-57, 109 S.Ct. 2115. Once a plaintiff established a prima facie case, the burden of production shifted to the employer to articulate a legitimate business justification for the use of the challenged practices.
 
 Id.
 
 at 658, 109 S.Ct. 2115.
 

 [16]
 

 . Pub.L. No. 102-166 § 105 amended 42 U.S.C. § 2000e-2 to codify this portion of the
 
 Wards Cove
 
 analysis. 42 U.S.C. § 2000e-2(k)(l)(A)(i) provides that if "a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity," the complaining party has established "a prima facie case of a disparate impact claim.”
 

 [17]
 

 . At the time, Louisiana Power and Light was a subsidiary of Entergy.
 

 [18]
 

 . Frost turned 48 on January 6, 1993.
 

 [19]
 

 . It is not clear from the record who authored Mr. Ohlmeyer's 1991 Louisiana Power and Light performance review. Mr. Martin did not sign the review.
 

 [20]
 

 .
 
 Sreeram
 
 is not an ADEA case. It is a Title VII case. However, that fact has no bearing on whether the
 
 Bienkowski
 
 rule has been supplanted.
 

 [21]
 

 . Entergy cites to
 
 O’Connor v. Consolidated Coin, supra,
 
 in support of this assertion. However, in that case, the plaintiff was replaced by a member of the protected class. That is not the case with respect to Mr. Ohl-meyer.
 

 [22]
 

 . We note that different courts have stated how a plaintiff can satisfy the fourth prong of the
 
 McDonnell Douglas
 
 prima facie case in ADEA cases differently. The federal First Circuit has held that an employee must show that the "employer subsequently filled the position, demonstrating a continuing need for the plaintiff's services.”
 
 Velez v. Thermo King de Puerto Rico, Inc.,
 
 585 F.3d 441, 447 (1st Cir.2009). The federal Third Circuit holds that an employee must show that "he or she has been replaced by a sufficiently younger employee to permit a reasonable inference of age discrimination.”
 
 Sempier v. Johnson & Higgins,
 
 45 F.3d 724, 728 (3d Cir. 1995). The federal Eighth and Tenth Circuits only require that the employee show that he or she was replaced by a "younger person.” See, e.g.,
 
 Loeb v. Best Buy Co., Inc.,
 
 537 F.3d 867, 872 (8th Cir.2008);
 
 Adamson v. Multi Community Diversified Services, Inc.,
 
 514 F.3d 1136, 1146 (10th Cir.2008) (noting that the prong is satisfied if the employee is replaced by a younger person "although not necessarily one less than 40 years of age."). The federal Ninth Circuit requires that the employee be "either replaced by substantially younger employees with equal or inferior qualifications or discharged under circumstances otherwise giving rise to an inference of age discrimination.”
 
 Diaz v. Eagle Produce Ltd. P’ship,
 
 521 F.3d 1201, 1207 (9th Cir.2008) (internal quotations omitted).
 

 [23]
 

 . It is not clear from the record precisely how old Mr. Massey was at the time of Ms. Porrovecchio's termination.
 

 [24]
 

 . Ms. Boudreaux was not “discharged” in the sense that she voluntarily resigned from Entergy. However, employees subject to adverse employment action short of discharge can also make ADEA claims.
 
 See, e.g., Woods
 
 v.
 
 Sheldon Independent School Dist.,
 
 232 Fed.Appx. 385, 388, n. 3 (5th Cir.2007) ("we limit our requirement for proof of 'discharge' to cases such as this, in which the adverse action alleged is loss of employment.”).
 

 [25]
 

 . At the time of his termination, Mr. Hickman had been employed by Entergy since the early 1970's.